174 Cal.App.4th 1557 (2009)
KEVIN Q., Plaintiff and Respondent,
v.
LAUREN W., Defendant and Appellant.
No. G040343.
Court of Appeals of California, Fourth District, Division Three.
June 19, 2009.
*1561 Law Offices of Opri & Associates and Debra A. Opri for Defendant and Appellant.
Law Offices of Marjorie G. Fuller and Marjorie G. Fuller for Plaintiff and Respondent.

OPINION
IKOLA, J.
Lauren W. (mother) appeals from a paternity judgment finding Kevin Q. is the father of her son Matthew W. (the child), even though *1562 Brent A., the child's biological father, signed a voluntary declaration of paternity.[1] We conclude that because the voluntary declaration of paternity signed by Brent functioned as a judgment of paternity under Family Code section 7573, the court's ruling must be reversed.[2]

FACTS
At a February 8, 2008 paternity hearing, Kevin, mother, Brent, and the child, through counsel, waived an evidentiary hearing and agreed the court could base its decision on "the factual matters set forth in the file," including declarations and exhibits that were inadmissible under the rules of evidence. No oral testimony was presented at the hearing. Accordingly, the following recitation of facts is taken from reporter's transcripts and documents filed with the lower court, including declarations and exhibits.
Kevin, an attorney who practices family law in Orange County, and mother "started a relationship in February of 2003." Mother and her first son moved in with Kevin for part of 2003, then moved out, but "resumed living with" Kevin at some point when mother was pregnant with her second son, the child.
The child was born in 2005. When the child was 20 months old, mother and the boys moved out of Kevin's home.
One month later, Kevin petitioned under section 7630 to establish a parental relationship as the child's presumed father, seeking legal and physical custody of, and reasonable visitation with, the child. He declared that: (1) he always knew he was not the child's biological father; (2) he "took the child into [his] own home[,] held him out as [his] own child and . . . paid all of [the child's] expenses from the time [mother] became pregnant up until she vacated [his] home"; (3) he desired custody of the child because he had "been a primary caretaker and under all circumstances [was] the person . . . most likely to allow [the child] frequent and continuing contact with [mother], who [had] restricted [his] time with [the child]"; (4) he believed it would be in the child's best interests for the court to award him custody of the child.
The next month, Kevin filed an order to show cause requesting custody of and visitation with the child pending a hearing. He also requested the court to order mandatory drug testing for mother and to appoint a mental health *1563 professional to perform a custody evaluation. Kevin declared the following. Early in mother's pregnancy with the child, Kevin and mother consulted a doctor about a possible miscarriage and together decided mother "should have the child if it was medically possible." Mother and her first son then moved in with Kevin. Kevin's friends and relatives attended a baby shower for mother; no one was told that Kevin was not the biological father. Kevin went to the hospital twice (once directly from work) when mother had false labor pains. Kevin was present at the child's delivery "and cut the umbilical cord." Upon the child's birth, Kevin took the baby into his home and openly held the child out as his natural son. "[The child's] birth announcement [stating] the [Q.] family proudly introduces their new son and brother" was "sent out to all friends and family."
Kevin also declared his parents visited the child, believing him to be their grandson. Kevin paid for medical insurance for the child, claimed him as a tax dependent, paid all the child's medical bills, and was "financially responsible for everything for him." Kevin bought a larger home near a park and moved the family there. He took care of the boys on some Saturdays and came home from work early on some weeknights to care for them. The foursome's 2005 Christmas card bore a photograph of Kevin, mother, and the boys. They attended holiday and other gatherings with Kevin's relatives. Kevin attended some of the child's doctor appointments and a surgery. He took the "boys to the park one to two times a day on the weekends" and some evenings.
Kevin further declared that during the time the family lived with Kevin, mother did not participate "in the day to day activities of caring for either boy." She was sometimes in school and had some night classes. Kevin fed them breakfast on weekdays, took the older boy to school, and went to work. A nanny took care of the boys during the day four days a week. A different nanny came "on Fridays to care for [the child] because [mother] said she was not capable of doing so." When Kevin could no longer sustain the expense of the Friday nanny, he instead came home from work by 1:00 p.m. on Fridays to accommodate mother.
Finally, Kevin declared in support of his order to show cause that mother suffered from emotional and health problems, alcoholism and drug abuse (including prescription drugs), and a poor driving record. Kevin and mother's relationship was destroyed in July 2006 when mother used cocaine, seriously damaged a friend's bathroom, and was taken to Hoag Hospital for evaluation as a dangerous or gravely disabled person under Welfare and Institutions Code section 5150.
Mother opposed Kevin's request for an ex parte custody order and argued there was no risk of immediate harm to the child. She had received telephonic *1564 notice of the ex parte hearing, but had never been served with Kevin's section 7630 petition to establish a parental relationship.[3] She declared the following. "[E]arly on," she told her friends and family that the child was not Kevin's son. She refused Kevin's "ultimatum [to] put his name on [the child's] birth certificate or he would not marry [her]." Mother did not approve the birth announcement before it was sent out. In 2006 she sent out Christmas cards with a photograph of only her and her sons. She encouraged Kevin "to tell his parents the truth."
Mother further declared that the child's biological father, whose identity was then confidential and whose paternity had been confirmed by DNA tests, had agreed that mother could have full custody of the child. The biological father was "not . . . involved" because he knew mother was a good mother. Kevin "usually worked [from] 7:30 am to 7:00 pm on Monday through Friday and one day on the weekend." He had hit mother and spanked her older son, and frequently smoked marijuana.
Mother also declared that during the last 13 months she lived in Kevin's house, she suffered from a painful medical condition that required her to take prescription drugs. Mother "never used cocaine" and believed "someone, maybe [Kevin], drugged [her] in July" 2006. She believed Kevin had "planned since [she] was pregnant to try to take [her] child because [Kevin] is sterile and says he cannot adopt" due to legal problems. In December 2006, mother graduated with a master's degree in psychology. She was currently "a stay at home mother with both [her] children," her father helped her financially, and she lived "in a three bedroom, two bath home with a back yard." She played "with the children and [took] them to the park, to the pool for swimming lessons, and to tennis lessons." She continued to hire the nanny "for extra help." Mother had allowed Kevin a few visits with the child, "but then [the child] began crying at exchanges and was returned with dirty diapers and sometimes hungry."
In support of mother, both the child's nanny and mother's sister declared she was a good mother. They had never seen mother drink alcohol or take illegal drugs. They had observed Kevin smoke or appear to be under the influence of marijuana. Mother's sister declared mother took care of the children's daily needs and took them to the park and to swimming and tennis lessons. She declared Kevin had hit mother, the child, and mother's oldest son.
At an ex parte hearing on Kevin's order to show cause, Judge Linda Miller found Kevin had "made a prima facie showing that he is a presumptive father *1565 of [the child]," and granted him visitation with the child on alternate weekends and every Wednesday overnight. The court ordered both parties to undergo drug testing with Dr. Soltani and a custody evaluation with an agreed-upon expert, all at Kevin's expense. A hearing on Kevin's order to show cause was scheduled for July 2007.
But two days later, mother filed an order to show cause requesting that the ex parte orders be set aside or stayed pending a hearing. She also requested a hearing on the ex parte orders within "20 days as required." She declared the child had "never been away from [her] for more than a night"; Kevin had not spent "a lot of time with [the child] when [they] were together"; and the child had never called Kevin "dad." Mother's counsel declared that mother's due process rights had been violated at Kevin's ex parte hearing. The attorney declared that Judge Miller met with the lawyers in chambers and mentioned a possible conflict because the judge knew Kevin "professionally as an attorney," although not personally. Judge Miller "stated that she had not read the pleadings, but found that [Kevin] had made a prima facie case as presumed father because [the judge] recalled [Kevin] coming into the courtroom and showing pictures of the minor to her and her staff." Judge Miller "went on to say that the whole courthouse believed the child was [Kevin's]."
The court set a hearing on mother's order to show cause for April 30, 2007, and advanced the hearing on Kevin's order to show cause to the same date.
On April 30, 2007, mother filed a response to Kevin's petition to establish a parental relationship, stating that the child's biological father had filed a voluntary declaration of paternity. Attached to mother's response was a copy of an April 25, 2007 voluntary declaration of paternity signed and dated by Brent, mother, and a witness at the Orange County Department of Child Support Services at 1055 North Main Street, Santa Ana. Also attached was a copy of an application to amend a birth record and acknowledgment of paternity/parentage signed and dated by Brent and mother.
That same day, Brent filed a declaration as follows. He was the child's biological father as proved by a DNA test. He was married at the time mother became pregnant with the child and "did not want to get [his] family involved." Brent "agreed to limited contact with [mother] but told her [he] would always support her and the baby." He paid her "$500 a month in cash during the pregnancy" and $300 child support after the child was born. He met mother "and [the child] at the park and restaurants sporadically," and mother often e-mailed or phoned "with little updates on the child."
*1566 Attached to Brent's declaration was a copy of a February 22, 2005 DNA identification test report from Genetics Center in Orange, concluding the probability of Brent's parentage of mother's then fetus was 99.983 percent.
The child's nanny declared she had seen Brent at mother's home and had heard the child call him "daddy." Brent often phoned. The nanny had never heard the child call Kevin "dad" or "daddy." Before Kevin's second Wednesday visit with the child, he asked the nanny to "baby-sit every Wednesday evening for [the child] while [Kevin] was at work."
Mother moved to disqualify Judge Miller. She also moved for a change of venue, alleging Kevin had been routinely appointed by Orange County "judicial officers as a minor's counsel in family law matters," and had "a long term relationship with nearly all of the judicial officers in Orange County," as well as investigators and mediators. The venue motion was denied, but the case was reassigned several times and eventually placed with Judge Josephine Staton Tucker because she probably did not know Kevin at all, whereas "every [other] judicial officer" knew Kevin (according to Judge Francisco Firmat). Judge Tucker continued the hearing on mother's order to show cause to June 5, 2007, with the existing temporary custody and visitation orders to remain in effect.
At the June 5 hearing, Kevin, mother, Brent, and their counsel were present in court. Mother's counsel advised the court that, in a related paternity case brought by mother against Brent, mother and Brent had "entered into a stipulation for judgment" on paternity. The stipulated judgment had not yet been entered in that related case, but was "being sent to the court for filing." Mother's counsel asked the court to stay Kevin's visitation with the child because the stipulated judgment conclusively rebutted Kevin's claimed presumed father status and, alternatively, because the visitation ruling was improperly ordered ex parte. The court ruled the existing temporary orders would remain in effect. The two casesKevin's paternity claim and mother's action against Brentwere reassigned and consolidated "for all purposes, in the interests of the policies supporting a direct calendar and a single judge for one family."[4]
On June 14, 2007, mother declared she had "entered into a Stipulated Judgment with [Brent] regarding custody and visitation."
That same day, Brent filed a declaration, declaring, inter alia, his "circumstances ha[d] changed in that [he was] currently single and desire[d] to be *1567 actively involved in [the child's] life." He declared, "It is my strong desire to step up to the plate and take on full responsibility and I hope my past inaction does not prejudice me, as I can afford the true biological father bond between father and son that no other person in the world can."
Attached to Brent's declaration was a "Stipulated Judgment on Paternity" signed by mother, Brent, and mother's counsel, but not executed by the court. The stipulation awarded joint legal custody to mother and Brent and sole physical custody to mother with reasonable visitation to Brent. As to child support, the stipulation stated: "a. At this time, both parties agree that they have sufficient funds to care for the child without child support. The parties have come to an agreement regarding the timeshare and agree that child support is unnecessary at this time. b. The issue of child support is reserved so that at a future date, if circumstances change, either party may request future child support."
On December 4, 2007, mother filed with the court a copy of the April 25, 2007 voluntary declaration of paternity, certified by California's Department of Child Support Services as having been submitted to that agency on April 25, 2007.
The consolidated cases were assigned to Judge Robert Monarch, who was "on the Civil panel, not on the Family law panel." Trial on the bifurcated issue of paternity was set for February 8 and 11, 2008. Judge Monarch ordered mother to meet with the child's counsel and submit to drug testing with Dr. Soltani.
On January 24, 2008, Brent's attorney moved to be relieved as his counsel, declaring Brent had failed to communicate with the lawyer for several months. Counsel had "made over 20 calls to [Brent's] cell phone," but the line was at least "temporarily" out of service.
The hearing on the bifurcated issue of paternity took place on February 8, 2008, before Judge Monarch. Upon stipulation of counsel, Judge Monarch proceeded to determine the issue "based on the factual matters set forth in the file, and the argument of counsel." Brent's counsel "stated for the record his attempt to locate [Brent] and that there was no appearance by him today." Kevin and mother "were sworn for examination" and waived their rights to a full trial.
As discussed in further detail below, Judge Monarch weighed Kevin's paternity claim against that of Brent and concluded Kevin is the child's legal father under the rebuttable presumption established in section 7611, subdivision (d) for a man who "receives the child into his home and openly holds out the child as his natural child."

*1568 DISCUSSION
Mother contends the court's finding that Kevin is the child's father is erroneous because (1) Brent's voluntary declaration of paternity was properly executed and filed with the Department of Child Support Services; (2) under section 7573, the declaration had the force and effect of a paternity judgment; (3) the declaration was never rescinded or set aside; and (4) under section 7612, subdivision (c), a paternity judgment rebuts the rebuttable presumptions under section 7611, including the presumption for a man who takes a child into his home and holds the child out as his own.

California's Statutory Scheme Governing Paternity
(1) The Family Code contains several interrelated statutes that together govern the judicial determination of paternity: (1) the Uniform Parentage Act (§ 7600 et seq.) containing rebuttable paternity presumptions; (2) the paternity judgment (or the pre-1997 conclusive paternity presumption) arising from a voluntary declaration of paternity (§ 7570 et seq.); (3) the conclusive paternity presumption for a nonsterile husband who cohabited with the mother at the time of conception, i.e., the presumption concerning the child of a marriage (§ 7540 et seq.; Craig L. v. Sandy S. (2004) 125 Cal.App.4th 36, 48 [22 Cal.Rptr.3d 606]); and (4) the Uniform Act on Blood Tests to Determine Paternity (§ 7550 et seq.).
Section 7611 integrates these statutes by stating that a "man is presumed to be the natural father of a child if he meets the conditions" (1) for a paternity judgment or conclusive presumption by filing a voluntary declaration of paternity, or (2) for a conclusive presumption of paternity over a child of a marriage, or (3) for a rebuttable presumption of fatherhood under any of section 7611's subdivisions.
Presumed fatherhood status under section 7611 entitles a man to custody of a child. (§ 3010.) "Although more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, `there can be only one presumed father.'" (In re Jesusa V. (2004) 32 Cal.4th 588, 603 [10 Cal.Rptr.3d 205, 85 P.3d 2].) How the various Family Code sections are reconciled and prioritized to identify a single presumed father is the subject of our inquiry here.
(2) Section 7570 et seq., concerning voluntary declarations of paternity, govern Brent's parentage claim. Under section 7574, a valid declaration of paternity must be signed by both a mother and the man she identifies as her child's "only possible father." (§ 7574, subd. (b)(5).) The declaration of paternity must contain, inter alia, a statement by the father that he understands he is waiving his constitutional right "to have the issue of paternity *1569 decided by a court" (§ 7572, subd. (b)(3)); "that he is the biological father of the child, and that he consents to the establishment of paternity" (§ 7574, subd. (b)(6)). Although hospitals must try to obtain signed declarations soon after the birth of infants to unwed mothers (§ 7571, subd. (a)), attesting parents may mail a notarized declaration "to the Department of Child Support Services at any time after the child's birth." (§ 7571, subd. (d), italics added.) In addition (and among other options), attesting parents may sign a declaration in person at a "local child support agency office[]" where staff witnessing the parents' signatures must forward "the signed declaration to the Department of Child Support Services . . . ." (§ 7571, subd. (f).)
The Legislature's declared intent in enacting these sections was, in part, to establish a "simple system allowing for establishment of voluntary paternity" (§ 7570, subd. (b)) as a "first step toward a child support award" (§ 7570, subd. (a)). The Legislature also found: "Knowledge of family medical history is often necessary for correct medical diagnosis and treatment. Additionally, knowing one's father is important to a child's development." (§ 7570, subd. (a).)
(3) Under specified circumstances, a voluntary declaration may be rescinded or set aside. Either parent may rescind the declaration within 60 days by filing a rescission form. (§ 7575, subd. (a).) In addition, "a court may set a declaration aside when court-ordered blood tests [citation] establish that the declarant is not the child's father." (County of Los Angeles v. Sheldon P. (2002) 102 Cal.App.4th 1337, 1340 [126 Cal.Rptr.2d 350].) The blood tests must be requested within two years of the child's birth. (§ 7575, subd. (b)(3)(A).) A person may request such tests, inter alia, "in an action to determine the existence or nonexistence of the father and child relationship pursuant to Section 7630 . . . ." (§ 7575, subd. (b)(3)(A).) Furthermore, either parent may "file an action or motion to set aside the voluntary declaration of paternity on any of the grounds described in, and within the time limits specified in, Section 473 of the Code of Civil Procedure [relating to mistake, inadvertence, surprise, or excusable neglect]." (§ 7575, subd. (c)(1).) The statute is not "intended to restrict a court from acting as a court of equity." (§ 7575, subd. (c)(4).) For example, "an equitable collateral attack on [a voluntary declaration of paternity] is available on the grounds of extrinsic fraud." (In re William K. (2008) 161 Cal.App.4th 1, 10 [73 Cal.Rptr.3d 737].)[5]
*1570 Unless rescinded or set aside, a voluntary declaration of paternity signed by adult parents on or after January 1, 1997, is treated as a judgment. Under section 7573 (enacted in 1996), such a declaration "filed with the Department of Child Support Services shall establish the paternity of a child and shall have the same force and effect as a judgment for paternity issued by a court of competent jurisdiction." The declaration must also "be recognized as a basis for the establishment of an order for child custody, visitation, or child support." (§ 7573.) The legislative intent behind section 7573 was to eliminate the "need to file a separate court action for [the] purpose" of giving a declaration the force and effect of a judgment of paternity. (Sen. Com. on Judiciary, Analysis of Assem. Bill No. 1832 (1995-1996 Reg. Sess.) as amended June 18, 1996, pp. 19-20.)
(4) In contrast, voluntary declarations of paternity signed before 1997 create a conclusive presumption of paternity with the same force and effect of the conclusive presumption under section 7540 (child of a marriage). (§ 7576, subd. (a).) This pre-1997 conclusive presumption may be rebutted with blood tests within three years of the declaration's execution (§ 7576, subd. (d)) and "override[s] all statutory presumptions of paternity except a presumption arising under Section 7540 [(child of a marriage)] or 7555 [(paternity index in genetic test of 100 or greater)]." (§ 7576, subd. (e).)
(5) Under another part of the Family Codethe Uniform Parentage Actsection 7611 establishes rebuttable paternity presumptions under each of its six subdivisions. Under subdivision (d)the basis of Kevin's claim to paternity of the childa man is a presumed father if he "receives the child into his home and openly holds out the child as his natural child."[6] These presumptions are rebuttable pursuant to section 7612, which provides: "(a) Except as provided in Chapter 1 (commencing with Section 7540) [(child of marriage)] and Chapter 3 (commencing with Section 7570) [(voluntary declaration of paternity)] of Part 2 or in Section 20102 [(repealed pilot program for voluntary declarations of paternity)[7]], a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence. [¶] (b) If two or more presumptions arise under Section . . . 7611 that conflict with each other, . . . the presumption which on the facts is founded on the weightier considerations of policy and logic controls. [¶] (c) The presumption under Section 7611 is rebutted by a judgment establishing paternity of the child by another man."
*1571 (6) There are no time limits or standing requirements for challenging, or asserting, a section 7611, subdivision (d) presumption. "Any interested party may bring an action at any time for the purpose of determining the existence or nonexistence of the father and child relationship presumed under subdivision (d) or (f) of Section 7611." (§ 7630, subd. (b).)

The Court's Ruling
We first summarize Judge Monarch's oral comments at the paternity hearing. The judge found Brent had filed a valid declaration of paternity which put "him at least on the level of being characterized as a presumed father." Kevin, on the other hand, was a presumed father under section 7611, subdivision (d), although the supporting evidence was "on the weak side, relative to the time period that he was actually involved in the child's life," the lack of an "existing family to abet the proposition," and the "emphasis on the first person singular, the I, I, I, me, me, me aspect of this and precious little with respect to the best interests of the child." "Nonetheless, based to a certain extent . . . on the law of the case, where there was a preliminary determination that there was a prima facie case [of paternity] established," Judge Monarch found Kevin met "the threshold of presumed paternity," but reiterated that Kevin's showing was "on the weak side."
Judge Monarch then interpreted sections 7612 and 7573 to place these two "presumed father[s]" on equal footing. The judge noted, however, the issue was "problematic" and "confusing" because a declaration of paternity "is the equivalent of a judgment" under section 7573. Indeed, California's "statutory scheme governing parentage" (Miller, Baseline, Bright-line, Best Interests: A Pragmatic Approach for California to Provide Certainty in Determining Parentage (2003) 34 McGeorge L.Rev. 637, 640) has been criticized as involving "an outmoded and confusing system of presumptions" (id. at pp. 638-639). Nonetheless, after acknowledging appellate clarification might be needed, Judge Monarch concluded the "spirit and intent" of sections 7573 and 7612, subdivision (c) limited "the recognition of [Brent] to that of a presumed father, on no less of a plateau than any other presumed father."
The judge then proceeded to balance, pursuant to section 7612, subdivision (b), the conflicting presumptions to determine which presumption on the facts was "founded on the weightier considerations of policy and logic. . . ." The judge found Brent's declarations had "inconsistencies within them"; the stipulated judgment "doesn't require him to pay support"; although his declaration stated "he has been paying $300 a month, [the judge] inferred, as a function of the input from counsel, that he really hasn't paid anything"; and the court was not "aware of any consistent contact" and "nothing in the file . . . show[ed] any consistent contact or desire to contact other than a *1572 declaration submitted earlier in the game, which is less than convincing." Most significant was Brent's "failure to appear after appropriate notice to participate in these proceedings." "[S]electing the best of the two available alternatives," and without "much choice in the matter with the only two alternatives presented," Judge Monarch determined Kevin was the child's father. The court clarified that its ruling applied to both consolidated cases and "took into consideration the comments of" minor's counsel.[8] The judge continued in effect the existing orders regarding visitation and custody.
Judge Monarch then issued a written statement of decision, "having reviewed the files in this matter, having considered the comments and arguments of counsel including the comments from Harold La Flame, attorney for the minor . . ., and pursuant to the stipulation of counsel that the Court may make the determination of paternity based upon the factual matters set forth in the files." As to Brent, Judge Monarch found Brent was the child's biological father; Brent had "failed to implement or confirm his status as the natural father of [the child]" and had "not, prior to or since the birth of [the child], taken any meaningful steps to have or maintain contact with [the child] or provide for his support"; Brent "attempted to create the appearance of involvement in [the child's] life by cooperating with [mother] to establish by stipulation his legal status as a father"; the "stipulation fails to provide for significant support or contact with the child"; Brent's "cooperation with said stipulation appears coerced"; and no evidence showed his declaration of paternity was filed with any state agency. Judge Monarch found Kevin was a presumed father under section 7611, subdivision (d), who had acted "as an interested and involved father figure to [the child]" from the child's birth until mother ended her relationship with Kevin, received the child into his home, and openly held out the child as his natural child. Balancing "considerations of policy and logic," Judge Monarch concluded Kevin was the child's psychological father, and found it to be in the child's best interests to designate Kevin the legal father.

Brent's Voluntary Declaration of Paternity Serves As a Paternity Judgment Making Him the Child's Legal Father
Kevin contends there is no evidence Brent's voluntary declaration of paternity was filed with the Department of Child Support Services. He points to Judge Monarch's written finding in the statement of decision that there was no evidence the declaration was "duly filed with the State of California or any other agency." Kevin claims mother failed to object to this finding and therefore waived "her right to challenge it on appeal." He concludes Brent's declaration lacks the force of a paternity judgment under section 7573 (which applies only to declarations filed with the Department of Child Support *1573 Services) and thus no judgment exists to rebut his own section 7611, subdivision (d) paternity presumption.
We review for substantial evidence Judge Monarch's finding the declaration was never filed with an appropriate agency. (In re Marriage of Feldman (2007) 153 Cal.App.4th 1470, 1479 [64 Cal.Rptr.3d 29] [substantial evidence standard of review applies to factual findings underlying paternity judgment].) Not only is this written finding (taken from Kevin's proposed statement of decision) inconsistent with the judge's oral finding the declaration was "valid," but it is clearly false. The certified copy of Brent's declaration of paternity leaves no doubt it was submitted to the Department of Child Support Services. The declaration was signed and dated by an employee of the Santa Ana office of the Department of Child Support Services, who witnessed the parents' signatures as contemplated under section 7571, subdivision (f). (See In re Raphael P. (2002) 97 Cal.App.4th 716, 738 [118 Cal.Rptr.2d 610] [Evid. Code, § 664's presumption that "`official duty has been regularly performed'" includes proper filing of voluntary declaration of paternity].) Nor has mother waived the right to challenge on appeal the court's erroneous finding in the statement of decision. Although Code of Civil Procedure section 634 requires a party to bring to the trial court's attention any omissions or ambiguities in the statement of decision (in order to avoid an appellate court implying findings to support the judgment), a party is free to argue on appeal that the court's factual finding is not supported by substantial evidence, even if not raised in the trial court.[9] "Generally, points not urged in the trial court cannot be raised on appeal. [Citation.] The contention that a judgment is not supported by substantial evidence, however, is an obvious exception to the rule." (Tahoe National Bank v. Phillips (1971) 4 Cal.3d 11, 23, fn. 17 [92 Cal.Rptr. 704, 480 P.2d 320].)
We turn to the central issue presented by this appeal: Does a man's voluntary declaration of paternityif properly signed and filed after 1996 and never rescinded or set asiderebut a rebuttable presumption of paternity under a subdivision of section 7611? "The resolution of this issue depends solely on statutory interpretation and is subject to our independent review." (In re Liam L. (2000) 84 Cal.App.4th 739, 743 [101 Cal.Rptr.2d 13].)
*1574 Kevin contends the court properly weighed his claim against Brent's because "the goal of the paternity statutes is `the protection of the child's well being.'" He argues our "Supreme Court has held that functioning interpersonal parent-child relationships trump biological parentage," relying on In re Jesusa V., supra, 32 Cal.4th 588. He asserts "that awarding [Brent] parental rights would mean that [the child] effectively would have no father." He reminds us that Brent "declined to be named as [the child's] father at the child's birth," concealed the fact from his wife and the public, and only signed the declaration of paternity when mother stipulated "she would not ask him for child support, and that he would not have any responsibility for physical custody."[10]
(7) In advancing these arguments, Kevin never addresses the statutory language of any Family Code section relevant to our inquiry here. Yet, we must "`begin with the fundamental rule that our primary task in construing a statute is to determine the Legislature's intent.' [Citation.] We must begin with the words of the statute." (Adoption of Kelsey S. (1992) 1 Cal.4th 816, 826 [4 Cal.Rptr.2d 615, 823 P.2d 1216].) The language of section 7573 is clear: A voluntary declaration of paternity, duly completed and filed after 1996, has "the same force and effect as a judgment for paternity . . . ."[11] Equally clear is the language of section 7612, subdivision (c): A section 7611 presumption "is rebutted by a judgment establishing paternity of the child by another man." And section 7612, subdivision (a), listing the section 7611 presumptions that are rebuttable, expressly excludes presumed father status arising from a declaration of paternity as one of the rebuttable presumptions. Even a pre-1997 voluntary declaration of paternity "override[s]" the rebuttable presumptions created by section 7611's subdivisions. (§ 7576, subd. (e).)
*1575 Section 7575 delineates the only circumstances under which a court may set aside a voluntary declaration of paternity. No statute grants a court the discretion to ignore, or treat as a rebuttable presumption, a voluntary declaration of paternity accorded the force of a judgment under section 7573. It is a "cardinal rule that courts may not add provisions to a statute." (Adoption of Kelsey S., supra, 1 Cal.4th at p. 827.)
Brent's declaration of paternity was filed within two years of the child's birth, yet Kevin never moved for genetic tests under section 7575 to disprove Brent's biological paternity. Nor has Kevin ever challenged Brent's declaration on equitable grounds such as extrinsic fraud. Thus, Kevin never availed himself of statutory options for challenging Brent's voluntary declaration.
(8) Although Kevin questions Brent's motivation for signing a declaration of paternity, he does not contend the declaration lacks legal effect. Nor can he. By signing the voluntary declaration, Brent waived his constitutional rights and established his paternity of the child with concomitant rights and obligations, including child support. (§§ 7572, subd. (b), 7573.) Although mother and Brent agreed in their stipulated judgment of paternity "that child support is unnecessary at this time," the issue was "reserved so that at a future date, if circumstances change, either party may request future child support." More importantly, "parties may not by agreement divest the court of jurisdiction to order child support." (Practice Under the California Family Code (Cont.Ed.Bar 2009) § 8.3, p. 306.) "[P]ublic policy also prohibits a parent from waiving or limiting, by agreement, a child's right to support." (Kristine M. v. David P. (2006) 135 Cal.App.4th 783, 789 [37 Cal.Rptr.3d 748].)
(9) In sum, Brent signed and filed a valid declaration of paternity that has the force of a judgment under section 7573 and trumps Kevin's presumption under section 7611, subdivision (d).
(10) The cases cited by Kevin do not support a different conclusion. In In re Jesusa V., supra, 32 Cal.4th 588, our Supreme Court (in a four-to-three decision) ruled "that biological paternity by a competing presumed father does not necessarily defeat a nonbiological father's presumption of paternity" (id. at p. 604) where both men's claims were based on section 7611, subdivisions (a) and/or (d) (Jesusa V., at p. 603). The majority made clear that it was "not selecting a policy to resolve competing claims when the statutory law is silent on the issue, but [was] instead giving effect to the language of the applicable statute" (id. at p. 618), i.e., section 7612, subdivisions (a) and (b) (Jesusa V., at pp. 606-607). Significantly, the majority clarified that its holding did not "apply to unwed biological fathers who . . . have sought to formalize their legal status by executing a voluntary *1576 declaration of paternity." (Id. at p. 612.) The court further stated: "It is plain the Legislature knows how to craft a categorical rule for rebuttal of a presumption of fatherhood when it wants to. [Citation.] In section 7612, subdivision (c), for example, the Legislature has provided that a statutory presumption `is rebutted by a judgment establishing paternity of the child by another man.'" (Id. at p. 613.)
In Craig L. v. Sandy S., supra, 125 Cal.App.4th 36, the mother's husband was entitled to section 7540's conclusive paternity presumption over the child of a marriage, as well as to section 7611, subdivision (a)'s rebuttable presumption. Craig held that because the mother and her husband "allegedly permitted the biological father to receive the child into his home and hold him out as his child, the biological father [was entitled to] assert the rebuttable presumption provided by section 7611, subdivision (d)." (Craig L., at p. 43.) The appellate court directed the trial court on remand to weigh the two men's competing presumptions under section 7611, subdivisions (a) and (d) (Craig L., at p. 50), "giv[ing] the greatest weight to [the child's] well-being" (id. at p. 53). Craig's holding was based on statutory interpretation of section 7541, not an insistence that the child's well-being must determine paternity findings.[12]
(11) Relying on Gabriel P., supra, 141 Cal.App.4th at page 863, Kevin contends that "since 1996 the court has had discretion to set [a voluntary declaration] aside in its consideration of the best interests of the child pursuant to certain enumerated factors, including any parent-child relationship, or lack thereof, between the man who signed the declaration and the child." But Gabriel P. provides no support for such a broad assertion. Instead, Gabriel P. simply paraphrased section 7575, which specifies the manner and circumstances under which a voluntary declaration of paternity may be rescinded or set aside. Relying on the specific statutory authorization of section 7575, subdivision (b)(1), Gabriel P. stated that a court has discretion to set aside a declaration of paternity "[u]pon receipt of test results indicating that the declarant is not the biological father," unless the court *1577 determines it is not in the child's best interests to set aside the declaration.[13] (Gabriel P., at p. 863, italics added.) This holding merely reiterated the express language of the statute which constrains the exercise of the court's discretion to set aside a voluntary declaration of paternity based on a showing that the declarant is not, in fact, the biological father.[14] This holding is far removed from Kevin's argument that would effectively allow the court to ignore section 7612, subdivision (c), which plainly states that a section 7611 presumption "is rebutted by a judgment establishing paternity of the child by another man" (§ 7612, subd. (c)), and by the omission of a voluntary declaration of paternity from the list of rebuttable presumptions in section 7612, subdivision (a). Until the voluntary declaration of paternity is set aside, it has the "force and effect" of a judgment. (§ 7573.) It is not a mere presumption to be weighed against competing section 7611 presumptions under section 7612, subdivision (b).
Finally, Kevin relies on In re Nicholas H. (2002) 28 Cal.4th 56 [120 Cal.Rptr.2d 146, 46 P.3d 932], where our Supreme Court held a section 7611 presumption cannot be rebutted in "an action in which no other man claims parental rights to the child, an action in which rebuttal of the section 7611[, subdivision] (d) presumption will render the child fatherless." (Nicholas H., at p. 70.) While Kevin acknowledges that the alleged biological father in Nicholas H. did not "come forward to assert any parental rights" and could not even be located so as to establish his paternity (id. at p. 61), Kevin asks us to consider that our decision here may render the child fatherless.
(12) No one can predict the consequences of the statutorily mandated result here. Perhaps the child will develop or retain a beneficial relationship with his biological father. On the other hand, if Brent continues to be incommunicado, his "paternal rights may ultimately be terminated in [a] dependency" or adoption process. (In re Zacharia D. (1993) 6 Cal.4th 435, 451 [24 Cal.Rptr.2d 751, 862 P.2d 751].) Although "a voluntary declaration may be a basis for a custody or visitation order [citation], the statutory scheme on voluntary declarations does not in and of itself determine child custody." (County of Los Angeles v. Sheldon P., supra, 102 Cal.App.4th at *1578 p. 1343.) In any event, our decision here is mandated by the Family Code. We may not rewrite the legislative scheme.
Because we reverse the judgment, we need not address mother's contention that insufficient evidence supported the court's finding Kevin was a presumed father under section 7611, subdivision (d).

DISPOSITION
Because Brent voluntarily declared his paternity, Brent is the child's legal father. The judgment is reversed and the matter is remanded to the trial court with directions to enter a new judgment declaring Brent to be the child's legal father. Mother shall recover her costs on appeal.
Sills, P. J., and O'Leary, J., concurred.
NOTES
[1] To protect their privacy, and for clarity, we refer to the parties by their first names or by their status in the case.
[2] All statutory references are to the Family Code unless otherwise stated.
[3] Kevin did not serve mother with the petition until three weeks later.
[4] On June 11, Judge Firmat entered judgment in mother's paternity case against Brent, finding mother and Brent were the child's parents based on the stipulated judgment of paternity. On June 20, Judge Firmat set the judgment aside because it had been mistakenly rubber stamped with Judge Firmat's name even though the case was not assigned to him.
[5] Federal law restricts the ways in which voluntary declarations of paternity may be set aside. States participating in the federal funding program, Temporary Assistance for Needy Families, must "`ensure that, after the [rescission] period, a voluntary acknowledgment [of paternity] may be challenged in court only on the basis of fraud, duress, or material mistake of fact. . . .'" (In re Mary G. (2007) 151 Cal.App.4th 184, 199-200, fn. 4 [59 Cal.Rptr.3d 703], second brackets added.)
[6] Section 7611's remaining subdivisions establish paternity presumptions for a man married to a child's mother at the time of the child's birth, a man who tried to marry the mother before the birth, a man who married or tried to marry the mother after the birth, or a man who dies before the birth, or under inoperative subdivision (e), for certain children born in foreign countries.
[7] Statutes 1993, chapter 219, section 211, pages 1694-1696.
[8] The comments of minor's counsel do not appear in the record.
[9] Kevin also challenges the DNA test report showing Brent is the child's biological father, arguing the document was inadmissible, lacked foundation, and did not comply with section 7550 et seq. Kevin, however, waived this challenge when he agreed to allow the court to determine the facts based on all of the documents in the file. Furthermore, in the statement of decision, Judge Monarch found Brent is the child's biological father. In any case, because Brent's declaration of paternity was never rescinded or set aside, the DNA report is unnecessary to resolution of this appeal.
[10] Mother counters with public policy considerations weighing against Kevin's asserting "a parental right to his ex-girlfriend's child," especially where the child was only 20 months old when mother removed the child from Kevin's home. She argues Kevin is interfering with the child's "normal bonding process with his actual father," Brent, and that there is "no existing marital family to protect" by ruling Kevin is the child's father.
[11] Appellate courts have recognized that this express mandate means what it says. (Gabriel P. v. Suedi D. (2006) 141 Cal.App.4th 850, 858, 862 [46 Cal.Rptr.3d 437] (Gabriel P.); In re Mary G., supra, 151 Cal.App.4th at pp. 197-201; In re Liam L., supra, 84 Cal.App.4th at pp. 742-743, 745, 746 [appellate court affirmed judgment in dependency proceeding that the defendant "was a presumed father based solely on a voluntary declaration of paternity" and stated the "statutory language is clear and unambiguous"; however, appellate court did not specifically comment on lower court's "`public policy balancing of the two fathers' under section 7612, subdivision (b)"].) In Barkaloff v. Woodward (1996) 47 Cal.App.4th 393 [55 Cal.Rptr.2d 167], one man's "section 7611, subdivision (d) presumption was conclusively rebutted under section 7612 by a stipulated `judgment of paternity of the child . . . by another man,'" although not based on a voluntary declaration of paternity. (Id. at p. 399.)
[12] Craig L. v. Sandy S., supra, 125 Cal.App.4th 36 concluded that section 7540's conclusive presumption was subject to section 7612, subdivision (b)'s weighing process, after construing the statutory language of section 7541 (which governs blood test challenges to § 7540's conclusive presumption). The appellate court noted that section 7541, subdivision (b) allows presumed fathers to move for blood tests to challenge the conclusive presumption and defines "`presumed father'" as having "`the meaning given in Sections 7611 and 7612.'" (Craig L., at p. 49.) "As [the court] read the statutory scheme, an unwed biological father has no right to blood tests under section 7541, subdivision (a), unless he has satisfied the requirements of sections 7611 and 7612, including the weighing process required by section 7612, subdivision (b)." (Ibid.)
[13] The trial court in Gabriel P., supra, 141 Cal.App.4th 850 had set aside the voluntary declaration of paternity by one of two alleged fathers based on test results indicating he was not the biological father. But the trial court had failed to recognize that this same alleged father could nevertheless claim presumed father status under section 7611, subdivisions (c)(1) and (d). (Gabriel P., at p. 864.) Under these circumstances, the weighing of competing presumptions under section 7612, subdivision (b) would be required.
[14] Section 7575, subdivision (b)(1) states: "[I]f the court finds that the conclusions of all of the experts based upon the results of the genetic tests . . . are that the man who signed the voluntary declaration is not the father of the child, the court may set aside the voluntary declaration of paternity unless the court determines that denial of the action to set aside the voluntary declaration of paternity is in the best interest of the child, after consideration of all of the following factors. . . ."