Filed 9/15/23  County of Los Angeles v. Heape CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| COUNTY OF LOS ANGELES,<br><br>Respondent,<br><br>v.<br><br>SHAWN HEAPE,<br><br>Appellant;<br><br>NORA NELLIE HEAPE,<br><br>Respondent. | B315372<br><br>(Los Angeles County Super. Ct. No. 20CWCS09157) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Frank W. Chen, Judge.  Dismissed in part and affirmed in part.

Arnold Freedland for Appellant.

Rob Bonta, Attorney General, Cheryl L. Feiner, Senior Assistant Attorney General, Gregory D. Brown, Supervising

Deputy Attorney General, and Ricardo Enriquez, Deputy Attorney General for Respondent County of Los Angeles.

No appearance for Respondent Nora Nellie Heape.

_____

This appeal concerns a form voluntary declaration of parentage (Parentage Declaration) that appellant Shawn Heape (Shawn) signed in 2007 after his ex-wife Nora Heape (Nora) gave birth to a son, C.H.  In 2020, the Los Angeles County Child Support Services Department (the Department) filed suit to obtain an order requiring Shawn to pay child support for C.H.  Shawn responded by filing an application to set aside the Parentage Declaration he signed years earlier.  The trial court denied Shawn's application and we consider whether Shawn's request to set the Parentage Declaration aside was timely, whether the declaration is otherwise void, and whether Shawn properly appealed an order denying a request to join C.H.'s unnamed biological father to the action.

## I.  BACKGROUND

In September 2020, the Department filed a complaint to compel Shawn to begin paying child support for C.H.  (The application sought child support on a going-forward basis; it did not attempt to compel Shawn to pay child support for years prior to the filing of the complaint.)  The Department's complaint alleged Shawn and Nora had signed a Parentage Declaration that was forwarded to the Department.

2

*A.     Shawn Applies to Rescind the Parentage Declaration*

In April 2021, Shawn filed a form application to rescind his Parentage Declaration.  He identified the following reasons for his request: fraud; material mistake of fact; his own mistake, inadvertence, or excusable neglect; and failure of the hospital to explain the form it gave him to sign.  In support of the application, Shawn submitted a memorandum of points and authorities arguing he was entitled to a court-ordered DNA test and to an order setting aside the Parentage Declaration if the DNA test proved he was not C.H.'s father.  He also submitted a declaration and attached a barely-legible copy of April 2021 DNA test results that he asserted established he was not C.H.'s father.

Shawn's declaration stated he and Nora were married and later divorced in 2005.  They had two children together, both of whom are past the age of majority and who now live with Shawn in Lake County, California.  Nora called Shawn in early 2007, informed him she was pregnant, and said she wanted to come to Lake County because she did not want her mother to know about the pregnancy.  Shawn rented a home for Nora and their children, rented a car for Nora, and helped pay her bills.  Nora called him for assistance in getting to the hospital to deliver the baby.  Shawn picked her up and drove her some distance, but he did not accompany her into the hospital.

According to Shawn's declaration, Nora asked him to take her home from the hospital after C.H. was born.  He agreed, and when he arrived at the hospital, he was given paperwork to sign in order for Nora to leave.  No one explained the paperwork.  If he had known one of the papers asserted he was C.H.'s father, he would not have signed it.

3

Shawn further declares that Nora moved back to Los Angeles with all three children within six months after C.H.'s birth. Shawn subsequently heard she was telling people he was C.H.'s father. He and Nora obtained a DNA test that revealed Shawn was not C.H.'s father. Nora told Shawn that C.H.'s father was a member of a local gang who had been stabbed to death before C.H. was born. Shawn saw C.H. over the years when visiting his children in Los Angeles. When Shawn took his two children out, Nora would not allow C.H. to accompany them. Shawn and Nora were in court in 2013 or 2014 regarding support for Nora. Nora listed C.H. on her court papers, but she later agreed Shawn was not responsible for C.H.

### B. The Department Opposes Recission

The Department opposed Shawn's request to rescind the Parentage Declaration, arguing Shawn did not meet the requirements for recission and his attempt to challenge the declaration was untimely and unsupported.

The Department attached Shawn's Parentage Declaration to its response (only the signed page of the form declaration, which references at least one other page of information, was attached). The declaration names Shawn as the father of C.H. and includes a signature in a box for the father's signature. The following language appears above the father's signature box: "I declare under the penalty of perjury under the laws of the State of California that I am the biological father of the child named on this declaration and that the information I have provided is true and correct. I have read and understand the rights and responsibilities described on the back of this form. I understand that by signing this form I am consenting to the establishment of

4

paternity, thereby waiving those rights.  I am assuming all of the rights and responsibilities as the biological father of this child.  I wish to be named as the father on the child's birth certificate.  [¶] I have been orally informed of my rights and responsibilities."

### C. *The Trial Court Denies the Application to Rescind the Parentage Declaration*

The trial court held a hearing on Shawn's application to rescind the Parentage Declaration.  During the hearing, the trial court asked Shawn if he recognized the signature on the Parentage Declaration as his own signature.  Shawn was unable to locate a copy of the document during the hearing, but he did not dispute the signature was his.

After hearing argument from the parties, the trial court denied Shawn's application and prepared a statement of decision. In the two paragraphs that follow, we recount the particulars.

The Parentage Declaration Shawn and Nora signed, which was filed with the Department, has the same force and effect as a court-issued judgment of parentage.  The provisions of the Family Code that became operative on January 1, 2020, apply to Shawn's April 2021 request to set aside the Parentage Declaration.  Since the set aside request was not filed within two years of the effective date of the Parentage Declaration, Shawn's request was barred under current Family Code section 7576.[1]  The Parentage

---

[1]    Subdivision (a) of this statute provides that after a 60-day period during which a Parentage Declaration can be rescinded, a person who signed a Parentage Declaration may commence a proceeding to challenge the declaration on the basis of fraud, duress, or material mistake of fact within two years of the filing of the declaration with the Department of Child Support

5

Declaration creates a paternity judgment that must be set aside before a court may order genetic testing. A prior judgment of parentage is determinative, even if subsequent testing establishes a person is not a biological parent.

Contrary to Shawn's contentions, since-superseded versions of pertinent Family Code statutes do not apply and would not require the court to order a DNA test anyway. The only circumstance in which the two-year statute of limitations does not apply under the current law is where the Parentage Declaration is void under section 7573.5, but Shawn did not argue any circumstance described in that statute applied in his case. Nor did Shawn argue the Parentage Declaration was deficient on its face or that there were procedural defects in its signing or filing that rendered it void. There is no authority supporting Shawn's argument that the hospital had a duty to explain the documents he signed. It is not appropriate, as a court of equity, to set aside the Parentage Declaration because the Legislature enacted the current Family Code sections as a comprehensive statutory scheme with strict statutory time limits—and it is not the court's role to evaluate the policy judgments made by the Legislature.

---

Services. Subdivision (b) of the statute states that the limitations period specified in subdivision (a) of the statute "shall not apply if the voluntary declaration of parentage is void under Section 7573.5 [enumerating six circumstances that, if true at the time of signing, establish a declaration is void]."

Undesignated statutory references that follow are to the Family Code.

*D.    Subsequent Proceedings*

Shawn filed a notice of appeal on September 14, 2021, identifying the order being appealed as the "Denial of Respondent's Request to Set Aside/Cancel a Voluntary Declaration of Paternity Dated March 4, 2007."

Later the same month, Shawn filed a request for an order joining C.H. and his biological father to the action.  The Department opposed the request.  It argued joinder would be improper because the only person who could properly be joined to the action was Nora.  The trial court denied Shawn's request for joinder at a hearing in November 2021 (and in a subsequently issued "Order After Hearing" filed on December 22, 2021).  The court found Family Code section 17404, subdivision (a) prohibits joinder and the biological father had not been identified and was not indispensable.  Shawn did not notice an appeal from the trial court denial of his joinder request.

## II.  DISCUSSION

Shawn's arguments urging reversal of the trial court's orders are unpersuasive.  His application to rescind the Parentage Declaration is governed by the current version of the relevant Family Code sections, and those sections impose a two-year statute of limitations on such requests—rendering his efforts to set aside the Parentage Declaration untimely by more than a decade.  Shawn's attempt to avoid the two-year limitations period by arguing the Parentage Declaration was void at the time of signing, which is a question governed by the Family Code statutes in effect at that time, is unavailing.  Finally, we have no jurisdiction to decide Shawn's challenge to the trial court's denial

of his request to join C.H.'s biological father to the Department's action because Shawn did not notice an appeal from that ruling.

>    A.    *Parentage Declarations and Statutory Application Rules*
>        1.    *Purpose of parentage declarations*

Section 7570, which discusses legislative findings and declarations related to Parentage Declarations, states: "There is a compelling state interest in establishing parentage for all children. Establishing parentage is the first step toward a child support award, which, in turn, provides children with equal rights and access to benefits, including, but not limited to, social security, health insurance, survivors' benefits, military benefits, and inheritance rights." (§ 7570, subd. (a)(1).) Section 7570 further pronounces that, "[a] simple administrative system allowing for establishment of voluntary parentage will result in a significant increase in the ease of establishing parentage, a significant increase in parentage establishment, an increase in the number of children who have greater access to child support and other benefits, and a significant decrease in the time and money required to establish parentage due to the removal of the need for a lengthy and expensive court process to determine and establish parentage and is in the public interest." (§ 7570, subd. (a)(2).)

>        2.    *Applicability of amendments to the Family Code*

Section 4 establishes the rules for when amendments to the Family Code apply to orders and events that occur before and after the effective date of such amendments. The rules are important in this appeal because many years passed between the

date on which Shawn signed the Parentage Declaration and the date on which the Department commenced this action—in the interim, the pertinent statutes were repealed and reenacted with significant revisions.

Pursuant to section 4, a new (or amended) law generally "applies on the operative date to all matters governed by the new law, regardless of whether an event occurred or circumstance existed before, on, or after the operative date, including, but not limited to, commencement of a proceeding, making of an order, or taking of an action." (§ 4, subd. (c).) But "[i]f an order is made before the operative date, or an action on an order is taken before the operative date, the validity of the order or action is governed by the old law [the law in effect before the operative date of the new law] and not by the new law." (§ 4, subd. (e).) "[P]roceedings after the operative date to modify an order made, or alter a course of action commenced, before the operative date" are permissible "to the extent proceedings for modification of an order or alteration of a course of action of that type are otherwise provided in the new law." (*Ibid.*) In addition, "[i]f a party shows, and the court determines, that application of a particular provision of the new law or of the old law in the manner required by this section or by the new law would substantially interfere with the effective conduct of the proceedings or the rights of the parties or other interested persons in connection with an event that occurred or circumstance that existed before the operative date, the court may, notwithstanding this section or the new law, apply either the new law or the old law to the extent reasonably necessary to mitigate the substantial interference." (§ 4, subd. (h).)

9

Shawn signed the Parentage Declaration in 2007. After that (but before the Department filed the current action in September 2020), there were various amendments to the Family Code. As pertinent here, the Uniform Parentage Act, enacted in 2018, repealed the relevant, then-existing Family Code sections and replaced them with substantially amended versions that would become operative on January 1, 2020. (Stats. 2018, ch. 876 [A.B. 2684], §§ 28-38.) Under both the current and prior versions of section 7573, a completed Parentage Declaration that has been filed with the Department has the same force and effect as a judgment for paternity or parentage. (§ 7573, subd. (d); former § 7573.) Because Shawn's Parentage Declaration qualifies as an order made before the operative date of the Uniform Parentage Act, its validity is governed by the prior versions of the pertinent Family Code sections. (§ 4, subd. (e).) Shawn's petition to rescind the Parentage Declaration, on the other hand, is governed by the current versions of the statute because it was filed, heard, and decided after the Uniform Parentage Act's operative date. (§ 4, subd. (c), (e).)

### B. Shawn's Request to Rescind the Parentage Declaration Is Untimely

As we summarized in the margin earlier, under current law a Parentage Declaration may be rescinded by filing a form with the Department within 60 days of the latest date of execution of the declaration. (§ 7575.) A signatory may also challenge the declaration in court on the basis of fraud, duress, or material mistake of fact within two years of the date the declaration is filed with the Department. (§ 7576.) The only identified exceptions to these limitations periods are for Parentage

10

Declarations that are void under section 7573.5.[2] (§ 7576, subd. (b).)

The Parentage Declaration submitted by the Department reflects Shawn signed the document on March 4, 2007, and parentage was established on March 19 of the same year. Shawn does not contend his Parentage Declaration is void for any of the reasons enumerated in section 7573.5. (He does argue the declaration is void for other reasons, which are unpersuasive for reasons we will next discuss.) Shawn's deadline to challenge the Parentage Declaration was thus in March 2009, and his petition is untimely.

In rejoinder, Shawn asserts that if current law applies, his statute of limitations to challenge the Parentage Declaration should have begun to run on the statute's operative date, not the operative date of the Parentage Declaration. Shawn does not adequately develop the argument and, regardless, the plain language of the statute contradicts his assertion. If the Legislature had intended the statute of limitations for Parentage

---

[2] Pursuant to section 7573.5, a Parentage Declaration is void when, at the time the declaration is signed, (1) the child has a presumed parent other than the woman who gave birth and the person seeking to establish parentage, (2) a court has entered a judgment of parentage, (3) another person has signed a voluntary declaration of parentage, (4) the child has a parent under section 7613 [conception using a semen or ova donor] or 7962 [reproduction via gestational carriers] other than the signatories, (5) the person seeking to establish parentage is a sperm or ova donor, or (6) the person seeking to establish parentage asserts they are a parent under Section 7613 and the child was not conceived through assisted reproduction. (§ 7573.5, subd. (a).)

11

Declarations signed prior to January 1, 2020, to run from the statute's operative date, it would and could have so stated.[3]

Shawn also protests the trial court's refusal to admit his DNA test results. However, the refusal to admit the test results is irrelevant to our determination. Shawn cites to no authority, nor are we aware of any, that provides the Parentage Declaration would be void even if there is evidence Shawn is not C.H.'s biological father.

### C. Shawn Has Not Established the Parentage Declaration Is Void

#### 1. Pertinent statutory provisions

Shawn devotes much of his appellate briefing to arguing various asserted defects or deficiencies in his Parentage Declaration render it void. As we have already explained, the versions of the relevant statutes that were in place when Shawn signed the Parentage Declaration govern its validity. We summarize those statutes below.

Former section 7571 provided "upon the event of a live birth, prior to an unmarried mother leaving any hospital, the person responsible for registering live births . . . shall provide to

---

[3] For the first time in his reply brief, Shawn asserts former versions of the Family Code statutes should apply to his request to set aside the Parentage Declaration under section 4, subdivision (h)—i.e., he argues application of current law would be inequitable. We will not address this argument, however, because it was not raised in Shawn's opening brief. (E.g., *People v. Tully* (2012) 54 Cal.4th 952, 1075 ["It is axiomatic that arguments made for the first time in a reply brief will not be entertained because of the unfairness to the other party"].)

the natural mother and shall attempt to provide, at the place of birth, to the man identified by the natural mother as the natural father, a voluntary declaration of paternity together with the written materials described in Section 7572.  Staff in the hospital shall witness the signatures of parents signing a voluntary declaration of paternity and shall forward the signed declaration to the Department of Child Support Services within 20 days of the date the declaration was signed.  A copy of the declaration shall be made available to each of the attesting parents." (Former Fam. Code § 7571, subd. (a) [effective October 12, 2001, to December 31, 2012].)

Former section 7572 identified the information that was to be contained in the written materials provided to unmarried parents, including information that an alleged father has the right to have the issue of paternity decided by a court, and that the father would voluntarily waive that right by signing the Parentage Declaration.  (Former Fam. Code § 7572, subd. (b) [effective January 1, 2000, to December 31, 2009].)

Former Family Code section 7573 provided that, subject to certain exceptions not relevant here, "a completed voluntary declaration of paternity, as described in Section 7574, that has been filed with the [Department] shall establish the paternity of a child and shall have the same force and effect as a judgment for paternity issued by a court of competent jurisdiction.  The voluntary declaration of paternity shall be recognized as a basis for the establishment of an order for child custody, visitation, or child support."  (Former Fam. Code, § 7573 [effective September 28, 2000, to December 31, 2011].)

Former section 7574 provided a form Parentage Declaration was required to include, among other things, (1) "[a]

13

statement by the mother that she has read and understands the written materials described in Section 7572, that the man who has signed the voluntary declaration of paternity is the only possible father, and that she consents to the establishment of paternity by signing the voluntary declaration of paternity," and (2) "[a] statement by the father that he has read and understands the written materials described in Section 7572, that he understands that by signing the voluntary declaration of paternity he is waiving his rights as described in the written materials, that he is the biological father of the child, and that he consents to the establishment of paternity by signing the voluntary declaration of paternity." (Former Fam. Code, § 7574, subd. (b) [effective September 28, 2000, to December 31, 2018].)

### 2. *Shawn's voidness arguments are unpersuasive*

The form Parentage Declaration submitted by the Department is a single page entitled "Declaration of Paternity." The form instructs "PAGE 1 AND 2" should be read before signing it. It contains fields for information regarding C.H.'s birth, and for identifying information for Shawn and Nora. It contains a declaration signed by Nora asserting she is "the unmarried natural mother" of C.H. and the man signing the form "is the only possible father of this child." It also contains a declaration signed by Shawn asserting that he is C.H.'s biological father, that he read and understood his rights and responsibilities, and that he consented to the establishment of paternity and waived those rights. The form also appears to have been duly signed by a representative of the hospital. The form bears a seal, and reflects parentage was established on March 19, 2007. The form, which appears to satisfy the statutory

14

requirements in place when Shawn signed the Parentage Declaration, is facially valid.

Shawn argues the Parentage Declaration is nevertheless void for four reasons: (1) he was not a person who was permitted to sign a Parentage Declaration as provided in current sections 7571 and 7573; (2) he received no advice at the hospital regarding the effect of the Parentage Declaration and the hospital staff was not competent to give him advice regarding the document; (3) Nora lied when signing the Parentage Declaration because she knew Shawn was not C.H.'s only possible father; and (4) the Parentage Declaration provided by the Department was only one page rather than two, and did not have the written materials identified in section 7572 attached. All of these contentions lack merit.

First, the current versions of sections 7571 and 7573 do not control the validity of the Parentage Declaration, which was signed in 2007 and is thus governed by the prior version of the statute. (§ 4, subd. (e).) Unlike the current statute, the prior version did not specifically enumerate the individuals, other than an unmarried mother, who are permitted to sign a Parentage Declaration. This same point about the law that applies similarly renders Shawn's reliance on *H.S. v. Superior Court* (2010) 183 Cal.App.4th 1502 inapposite—a case he cites for the proposition that a Parentage Declaration is void if a party who signed it is not statutorily permitted to do so. In addition, that case is also unavailing on its own terms. The opinion held the specific Parentage Declaration before it void, but as relevant here, it explains Parentage Declarations executed by persons (married mothers) who were not permitted to sign Parentage Declarations are merely voidable (not void). (*Id.* at 1508.)

15

Second, Shawn's contention that the Parentage Declaration is void because hospital staff was not competent to advise him and did not in fact advise him is not supported by the statute. Former section 7571 required hospital staff to provide the Parentage Declaration "to the natural mother" and "attempt to provide . . . [the Parentage Declaration] to the man identified by the natural mother as the natural father." It did not require hospital staff to advise Shawn in any way. Because hospital staff was not statutorily required to provide him with any advice, their competence to do so is irrelevant.

Third, Shawn's contention that Nora lied by signing the Parentage Declaration and thereby falsely asserted only Shawn could be C.H.'s natural father does not void the Parentage Declaration. Shawn cites no statutory or other authority, and we are aware of none, that provides an untruthful statement on the Parentage Declaration alone voids the document.

Fourth, Shawn's argument that the Parentage Declaration submitted by the Department includes only the actual signature page and not the additional information that was required to be provided to the signor does not render it void. By signing the Parentage Declaration, Shawn declared under penalty of perjury that he was C.H.'s biological father, had read and understood his rights and responsibilities, was consenting to establishment of paternity and waiving his rights, and was assuming the rights and responsibilities as C.H.'s biological father. The Parentage Declaration was filed with the Department, as demonstrated by the stamp on the form and the fact that the Department produced the document in the trial court. (See *Kevin Q. v. Lauren W.* (2009) 175 Cal.App.4th 1119, 1136 ["The *certified* copy of [a Parentage Declaration] leaves no doubt it was submitted to

16

the [the Department]"]; *In re Raphael P.* (2002) 97 Cal.App.4th 716, 738 [Evidence Code section 664's presumption that "'official duty has been regularly performed'" includes proper filing of a Parentage Declaration].) That the Department did not produce, when filing the declaration in court for this action, the additional documentation that was to be provided to Shawn when he was given the Parentage Declaration does not negate the force and effect of the signed document.

Moreover, Shawn's declaration does not assert he was only provided with the page he signed and not provided with the appropriate explanatory paperwork, or that he read the explanatory information and it somehow fell short of meeting its informational obligations. He merely states that no one explained the form to him. That is insufficient to render the document he signed void.

### D.    Joinder

Shawn argues the trial court erred by refusing to join C.H.'s unidentified (and, according to Shawn, deceased), biological father as a party. The Order After Hearing denying Shawn's request for joinder was entered in December 2021. Shawn, however, did not file a notice of appeal from the order denying his request for joinder at any time, much less within 180 days of that order. That is the outer limit for a timely notice of appeal. (Cal. Rules of Court, rule 8.104(a)(1)(C).)

"[T]he filing of a timely notice of appeal is a jurisdictional prerequisite. 'Unless the notice is actually or constructively filed within the appropriate filing period, an appellate court is without jurisdiction to determine the merits of the appeal and must dismiss the appeal.' [Citations.]" (*Silverbrand v. County of Los*

17

*Angeles* (2009) 46 Cal.4th 106, 113.)  We accordingly lack jurisdiction to review Shawn's contentions regarding the request for joinder.

### DISPOSITION

The appeal is dismissed insofar as it challenges the trial court's denial of Shawn's request for joinder.  In all other respects, the court's order is affirmed.  The Department shall recover its costs on appeal.


NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS



BAKER, J.

We concur:


RUBIN, P. J.


KIM, J.