Filed 10/24/13

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| In re BRIANNA M., a Person Coming Under the Juvenile Court Law. | B245203 |
| | (Los Angeles County Super. Ct. No. CK93880) |
| RON H., | |
|     Plaintiff and Respondent, | |
|     v. | |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES, | |
|     Defendant and Respondent; | |
| FRANCISCO M., | |
|     Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Marilyn Kading Martinez, Commissioner. Affirmed and remanded.

Michelle L. Jarvis, under appointment by the Court of Appeal, for Defendant and Appellant.

Frank H. Free, under appointment by the Court of Appeal, for Plaintiff and Respondent.

No appearance for Defendant and Respondent.

Aida Aslanian, under appointment by the Court of Appeal, for Minor.

_____

Francisco M. (Francisco) is the biological father of eight-year-old Brianna M.; Ron H. (Ron) is the father of Brianna's half-brothers and has raised Brianna since she was an infant. When Brianna was adjudicated a dependent child, both men appeared and sought presumed father status. Although both men arguably met the statutory criteria for presumed father status, the juvenile court designated Ron as "the" presumed father because he had a well-established parental relationship with her, while Francisco—who had seen Brianna only a few times since she was an infant—did not.[1]

Francisco appeals, contending that as a matter of law, the juvenile court was required to grant him presumed father status because he executed a voluntary declaration of paternity when Brianna was born. That voluntary declaration, Francisco says, has the legal effect of a paternity judgment; thus, under Family Code section 7612, subdivision (c) (hereinafter, section 7612(c)),[2] it rebutted Ron's "presumption" of paternity under section 7611, subdivision (d) (hereinafter, section 7611(d)).[3]

---

[1] "Although more than one individual may fulfill the statutory criteria that give rise to a presumption of paternity, 'there can be only one presumed father.'" (*In re Jesusa V.* (2004) 32 Cal.4th 588, 603.)

[2] All subsequent undesignated statutory references are to the Family Code.

[3] Section 7611(d) provides: "A man is presumed to be the natural father of a child if he . . . receives the child into his home and openly holds out the child as his natural child."

2

We affirm.  As we discuss below, we conclude that section 7612(c)—which provides that "[t]he presumption under Section 7611 is rebutted by a judgment establishing paternity of the child by another man"—has no application here.  The "presumption" of paternity rebutted by section 7612(c) relates solely to *biological* paternity, and to the rights (custody and visitation) and responsibilities (child support) that spring from it.  Biological paternity is irrelevant to "presumed father" status in a dependency action, however.  In a dependency action, a "presumed father" is not a man who is "presumed to be the natural father of a child" (§ 7611), but rather is a man who has "'demonstrate[d] a full commitment to his paternal responsibilities—emotional, financial, and otherwise'" (*In re Jerry P.* (2002) 95 Cal.App.4th 793, 801-802), and thus is entitled to seek reunification services and custody.  Therefore, for dependency purposes, a voluntary declaration of paternity executed by one man does not, as a matter of law, extinguish another man's presumed father status.  The juvenile court thus did not err in designating Ron as Brianna's presumed father.  However, because proper notice was not provided under the Indian Child Welfare Act (ICWA), we remand to the trial court with directions to ensure that ICWA notice is properly given.

## FACTUAL AND PROCEDURAL BACKGROUND

### I.      Detention and Petition

Brianna (born Mar. 2005) is the biological daughter of Stephanie P. (mother) and Francisco.  Brianna's half-brothers, Ronnie H. (born Mar. 2007) and Anthony H. (born Apr. 2008), are the children of mother and Ron.  Brianna's half-sister, L.G. (born Dec. 2011), is the daughter of mother and Jonathan G. (Jonathan).

On June 6, 2012, the Los Angeles County Sheriff's Department conducted a parole compliance check of Jonathan at the family home.  Jonathan and mother took the children into one of the bedrooms and barricaded themselves in it.  When deputies entered the room, they discovered a loaded gun accessible to the children and "deplorable" home conditions.  The home "was extremely dirty and messy, [a] non-

3

operational dishwasher was in the bedroom, the home had a foul odor, trash [was] strewn throughout, roaches [were] everywhere, dead flies were in the refrigerator and animal feces [were] scattered throughout.  It was also reported that the child [L.G.] was dressed in a heavily urine soiled blouse and she too also had [a] strong foul odor to her."  The sheriffs arrested mother and Jonathan and detained the children.

The Department of Children and Family Services (DCFS) filed a juvenile dependency petition for Brianna and her siblings on June 11, 2012.  It alleged:  Jonathan hit and choked mother in the children's presence, and such violent conduct in the children's presence endangered their health and safety and placed them at risk of physical harm (a-1, b-2); mother and Jonathan allowed the children access to a loaded firearm and refused to comply with law enforcement requests to exit the home (b-1); the family home was in a filthy and unsanitary condition, endangering the children's health and safety (b-3); and mother had a history of illegal drug use and was a current user of marijuana, which rendered her incapable of providing regular care for the children (b-4).

DCFS filed a detention report on June 11, 2012.  It stated that during a June 6 interview, mother identified Francisco as Brianna's biological father.  Mother said Francisco was listed on Brianna's birth certificate, but he had not had any contact with her.  During an interview conducted the same day, Ron said he had raised Brianna since she was three months old and considered himself her father.  He said Francisco had been in jail when Brianna was born.  Ron's relationship with mother had ended a few years earlier, and Ron and mother had difficulty getting along.  Brianna, Anthony, and Ronnie usually stayed with Ron or his sisters, Laura T. or Vanessa H.; the children stayed with mother only when she picked them up because he was working.  Ron said he was aware of domestic violence between mother and Jonathan and thought mother was unable to care for the children.  Ron said he would like Brianna to be placed with him.

On June 11, 2012, mother filed a "Parentage Questionnaire," in which she stated that Francisco had been present at Brianna's birth and had held himself out as Brianna's parent, but had not received Brianna into his home.  Mother said Francisco had signed "the birth certificate, or other paperwork naming him the father."

4

On June 11, 2012, the juvenile court ordered the children detained. It found that Francisco was the presumed father of Brianna, Ron was the presumed father of Ronnie and Anthony, and Jonathan was the presumed father of L.G. The court ordered Ronnie and Anthony released to Ron, who was sharing a home with the paternal grandfather and paternal aunts. The court said it could not then order Brianna placed with Ron because he had been convicted in 2003 of resisting arrest, but it agreed to place Brianna with the paternal aunts in the family home on the condition that Ron move out temporarily until DCFS could obtain a waiver of his criminal conviction.

DCFS filed an amended petition on July 25, 2012. It alleged that mother and Jonathan created a dangerous and unsanitary home environment (b-1); the children were exposed to violence by Jonathan against mother, placing the children at risk of harm (b-2); mother had an unresolved history of substance abuse and abused marijuana, placing the children at risk of harm (b-4); and Jonathan had an unresolved history of substance abuse, which placed the children at risk of harm (b-5).

## II.     Interim Reports

Francisco filed a "JV-505 Statement Regarding Parentage" on July 25, 2012. It stated that he believed he was Brianna's father and had established parentage of Brianna by signing a voluntary declaration, dated March 23, 2005. It further stated that Brianna had lived with Francisco from birth to 2006, and that he had told "everyone I know including my family" that Brianna was his daughter. It continued: "Prior to mother's disappearance I saw my daughter up until my daughter was 1 yr old. In 2010 mother contacted my family [and] allowed me to see her twice that year. When mother disappear[ed] I did try to locate my daughter but I looked only in the State of AZ. I did not know mother had relocated to California until 2010. In 2010 I tried to have more visits w/ my daughter but was told by mother that [Ron] did not want my daughter to see me." Francisco also filed a notification of Indian status, stating that he might be eligible for membership in the Gila River Community.

DCFS filed a jurisdiction/disposition report in July 2012. It stated that Ron had a criminal record, having been arrested in 1997 for receiving stolen property, and convicted in 2005 of obstructing a police officer. Brianna, Ronnie, and Anthony had been placed with Ron, and L.G. had been placed in foster care. Ron was sharing a home with his two sisters, father, and niece, and the children were reported to be thriving in the family home. Ron had a full-time job, where he had been employed since 1997. Ron's sister, Laura T., was involved with the children's day-to-day care. According to DCFS, Ron "is able to support himself and the children Ronnie and Anthony and in fact is willing and committed to also caring for the child Brianna on a permanent basis despite the fact that the child Brianna is also not the father Ron [H.]'s child. The father Ron [H.] stated that he considers the child Brianna his child because he has raised the child Brianna since the child Brianna was just a few months old. . . . The father Ron [H.] is committed to complying with the Court orders in order to retain custody of the children."

The report also stated that during a July 23, 2012 interview, mother said she became pregnant with Brianna when she was 17 years old. Francisco hit her both before and after she was pregnant. When Brianna was about two months old, Francisco grabbed a kitchen knife and threatened to kill her. Mother called the police and pressed charges. A month later, she left Francisco and then met and became involved with Ron. Mother, Ron, and Brianna moved to Los Angeles, where Ronnie was born. Mother said Ron "always worked and took care of us." Mother said she and Ron had a good relationship for about five years, until she began using methamphetamines.

Francisco told the social worker that he met mother in Arizona in about 2003, and that he, mother, and Brianna lived together until mother "disappeared" when Brianna was about nine months old. He did not know where mother and Brianna had gone. In 2010, mother contacted Francisco's sister and allowed Francisco to visit Brianna, but then disappeared again. He admitted to a single episode of domestic violence with mother when Brianna was two months old. He was currently unemployed because he was caring for his father, who suffered from kidney failure. Francisco said he was in a position to care for Brianna and wanted custody of her.

6

The multidisciplinary assessment team report attached to the DCFS report said Brianna was very close to Ron and enjoyed spending time with him. She was not aware that he was not her biological father. She reported missing Ron when he was not allowed to spend the night in the family home, and said she was very happy once Ron was allowed to resume living in the home.

The court held a preresolution conference on July 25, 2012. The court stated that based on Francisco's paternity questionnaire, Francisco appeared to be Brianna's presumed father. The court said the Indian tribe to which Francisco reportedly belonged was not federally recognized, and it therefore did not order that ICWA notice be given. The court granted Francisco monitored visits with Brianna.

## III. Ron's Welfare and Institutions Code Section 388 Petition Seeking Presumed Father Status

Ron filed a Welfare and Institutions Code section 388 petition on September 13, 2012, asking the court to (1) vacate the finding that Francisco is Brianna's presumed father, and (2) find that Ron is her presumed father. In support, Ron filed a declaration in which he stated as follows:

"1.     I have lived with the child Brianna [M.] since she was nine months old.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"4.     I have always considered Brianna as my daughter and I have made representations that she was my daughter to all of my friends and family members and co workers. People do not know that she is not my biological daughter and would be surprised to find out such a fact.

"5.     Brianna has spent time with my family, even without me being present. They all treat Brianna like she is my daughter and love her the same way that they love my two sons.

"6.     I have taken trips with Brianna and her brothers and we have done family outings and activities together.

"7.     I have provided all necessities for Brianna including food, clothing, and shelter since the time that she was an infant until now.  I am prepared to continue providing for her in the future with whatever she needs.

"8.     All of her medical needs have been met by me and I have been the person making medical decisions for her and taking her for regular medical appointments.

"9.     The mother and I separated in October of 2010.  Even after we separated, Brianna continued to reside with me and visited with her mother.  She spent the majority of the time with me and her brothers at my residence.

"10.    Brianna has her own room at my house.

"11.    I have enrolled Brianna into school since she has been of school age and she currently attends the same school as her brother Ronnie.

"12.    Brianna considers me as her father and calls me 'dad.'

"13.    [Francisco] has not seen Brianna and has not visited with her, not even after the last court date when the court allowed for him to have monitored visitation with her.  He was supposed to call my sister to set up a visit but never called on the date scheduled. . . ."[4]

Francisco filed opposition to the Welfare and Institutions Code section 388 petition on October 4, 2012.  In a declaration in support of his opposition, Francisco stated as follows:

"1.     I was present at Brianna's birth and signed the voluntary declaration of paternity.  As such, my name appears on Brianna's birth certificate.

"2.     I lived with Mother . . . in Arizona from on or about 2003 until I became incarcerated in February of 2006.  The child, Brianna [M.], was 11 months old at that time.

"3.     When Mother, Brianna and I lived together, we lived with my father, my sister . . . , and my sister's children.

---

[4]     On September 19, 2012, DCFS reported that a visit had been scheduled between Francisco and Brianna on August 18, but Francisco failed to show up for the visit.

"4.    After I was incarcerated, Mother continued to live at our shared residence with my family, until approximately August of 2006.

"5.    While I was incarcerated, Mother and Brianna came to visit at least once per week, but frequently as often as three times per week.

"6.    In early August of 2006, when Mother came to visit me in custody, she informed me that she had been speaking to another man on the phone and apologized to me.

"7.    Later that day, Mother dropped Brianna at our family home with my family members.

"8.    Mother returned to the home at 9:30 pm that night, demanding her daughter be returned to her care. My family complied.

"9.    Since that night, no one in my family or I had any contact with Mother. Mother did not answer my family's phone calls, and eventually Mother's phone number was no longer in service.

"10.    I had no contact with any of Mother's relatives, so I had no other way to attempt to contact Mother.

"11.    I was released from custody in January of 2007.

"12.    After my release I attempted to locate mother by contacting 'Information Services,' at least once per month throughout 2007. There was no information on file to contact Mother.

"13.    All of my attempts to contact Mother were within Arizona, because I had no knowledge that Mother had moved to California.

"14.    I have always considered Brianna as my daughter and have made representations to all of my friends and family, and any others who would hear it.

"15.    My father and sister assisted in caring for Brianna when she lived with me.

"16.    My relatives provided childcare for Brianna while I was at work, when Mother and Brianna lived with me until 2006.

"17.    When we lived together we . . . went on family outings together, along with my sister and father, including going shopping, eating at restaurants, trips to the park, etc.

9

"18.    While Brianna lived in my home, I provided for necessities, including food, clothing and shelter.  For a period, I was unemployed and my family provided financial support for me, Brianna, and Mother.

"19.    I provided transportation to and participated in all of Mother's prenatal care appointments.

"20.    I also took Brianna to all of her medical appointments after birth until I was incarcerated in 2006.

"21.    In June of 2010, Mother brought Brianna to Arizona and stayed in the home with me and my sister . . . , my son, and my nieces and nephew for approximately 2-3 weeks at a time over a period of five months.

"22.    During Brianna's stay in 2010, I took Brianna to the park, took her shopping, took her to eat, etc.  Often I would take Brianna out on her own, though[] sometimes my sister and/or Mother came as well.

"23.    During her stay in 2010, Mother allowed me to spend time with Brianna, but told me not to tell Brianna that I was her father, otherwise I would not see her again. Mother said she did not want to confuse Brianna, because Brianna believed [Ron] was her father.  My sister and I complied because we wanted to have contact with Brianna.

"24.    During one of her stays with me and my family in 2010, Brianna approached me and told me that she has[] 'two dads.  My daddy, Ronnie in California, and you.'  . . ."

On October 10, the court ordered DCFS to secure a copy of Francisco's alleged voluntary declaration of paternity and ordered Francisco to provide copies of Brianna's birth certificate to all counsel.  On October 29, Francisco filed with the court a copy of Brianna's birth certificate that identified him as Brianna's father.  The birth certificate was not signed by either parent, and it did not indicate whether the parents were married or unmarried.  The court was never provided with the voluntary declaration of paternity that Francisco said he signed.

The court held a hearing on October 29, at which it found Francisco met the statutory criteria to be deemed a presumed father.  It explained:  "It may not be rebuttable

10

that the biological father who signs the birth certificate can be rebutted as a presumed father. So because he is not only the biological father but he has signed the voluntary declaration of birth, [Francisco] is a presumed father." The court also found Ron met the presumed father criteria: "From this child's infancy, [Ron] has held Brianna out as his child. She has lived with him substantially all of her life except for some very brief periods. He has provided for her and her needs, physical and psychological, on a daily basis. He has treated her in all respects as his own child, along with his own two biological children, Ronnie and Anthony. The child knows him as her dad. . . . So not only has [Ron] held himself out and received the child into his home and treated her in all respects as his own child and provided for her basically all of her life on a daily basis, she believes him to be her father because he has done all those fatherly things. So he, too, is a presumed father, and that's 7611(d)."

The court then weighed "policy and logic" to determine that Ron should be deemed "the" presumed father. The court explained: "Throughout this child's life, she has seen [Ron] as her father. Perhaps the overarching factor is to preserve the stability of the child in a family unit. And not only has she lived with [Ron] all of her life, she, too, has lived with two of her siblings, Ronnie and Anthony. And they are not dissimilar in age. Brianna is seven. Ronnie is five, and Anthony is four. So at least for four years, these three children have lived together.

"This is a family unit. It appears to be stable. [Ron] presents [himself] as a stable person. In fact, by court order, he has the custody of his two children Ronnie and Anthony. Brianna has been detained with a relative, and Brianna and the relative reside in the same household as [Ron] and Ronnie and Anthony. So there has been actually no disruption of Brianna being in the same family unit as [Ron].

"Brianna does not have any relationship with [Francisco] at all. She has met him recently a couple of times. Since the court proceedings began, he has had a couple of visits. So even though she knows him to be a dad, she does not know him to be her father figure.

11

"What I must address also is whether or not [Francisco] was truly thwarted in having a relationship with Brianna, and I find that the totality of the evidence says that he was not. He and the mother lived together for the first several months of this child's life, and then they separated. Very soon after their separation, the child's mother . . . began a relationship with [Ron], and they pretty much remained in a relationship for about at least the next five years.

"When [mother] and [Francisco] separated in approximately June of 2005—that's what the evidence supports, although [Francisco] thinks it might have been a few months after that—they were not in a relationship. He did not have contact with his child.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"[Francisco] has had reasonable opportunities to secure his parental rights. What he did in 2010 when the child was five was to make some inquiries with the information number and did not find [mother] listed. He checked only in Arizona because he did not have, he said, any information that mother wouldn't be in Arizona.

"There's no evidence whatsover that he sought legal resource to claim his paternal rights over this child. He didn't go to court. He didn't file anything. He didn't seek legal advice.

"And while he might have been concerned that mother threatened, according to him, to not allow further visits if he told Brianna that he was her father—and this is already in 2010—he simply accepted that, and he did nothing. He did not put his parental rights on a high enough plane.

"He reasonably should have known from his sister, who I believe is the paternal aunt, that mother might be in California. But even after 2010, he did not attempt any legal recourse to assert his paternal rights.

"The child is entitled to stability and permanency. For all of her life, she's had that from [Ron], and that shall not be disturbed."

The court then found, based on the sustained petition, that Brianna and her siblings were dependents of the court pursuant to Welfare and Institutions Code section 300, subdivision (b). It further found by clear and convincing evidence that substantial danger

existed to the children and no reasonable means existed to protect them without removing them from mother's custody. The court found Francisco was Brianna's biological father, but ordered no visitation between Brianna and Francisco. Finally, it ordered Brianna, Ronnie, and Anthony placed with Ron, who was to receive family maintenance services.

Francisco timely appealed.

## DISCUSSION

Francisco contends that because he signed a voluntary declaration of paternity, as a matter of law he should be designated Brianna's sole presumed father. He further urges that notice was not properly given as required by the ICWA.

DCFS takes no position on the paternity issues, but concedes that ICWA notice was not properly given. Ron and Brianna urge this court to affirm the paternity finding, asserting that there is no substantial evidence that Francisco signed a voluntary declaration of paternity, this is not an appropriate case in which to rebut Ron's presumed father claim, and the court had discretion to set aside Francisco's voluntary declaration of paternity. We consider these issues below.

## I.     Overview

Three separate statutory schemes are relevant to our inquiry: (1) the Uniform Parentage Act (§§ 7600-7730); (2) sections 7570 to 7577, which address establishment of paternity by voluntary declaration (§§ 7570-7577); and (3) Welfare and Institutions Code section 300 et seq., which address dependent children. We begin with an overview of these statutes.

### A.     *The Uniform Parentage Act*

The Uniform Parentage Act (UPA) sets out a series of rules and presumptions relevant to the "parent and child relationship," defined as "the legal relationship existing between a child and the child's natural or adoptive parents incident to which the law

13

confers or imposes rights, privileges, duties, and obligations." (§§ 7601, 7610.) The "parent and child relationship" "includes the mother and child relationship and the father and child relationship." (§ 7601.)

Section 7611 provides that a man is "presumed to be the natural father of a child" if any of the following is true:

(1) He "meets the conditions provided in Chapter 1 (commencing with Section 7540)"—i.e., he is married to and cohabiting with the child's mother and "is not impotent or sterile." (§ 7540.)

(2) He "meets the conditions provided in . . . Chapter 3 (commencing with Section 7570)"—i.e., he has executed a voluntary declaration of paternity.

(3) He "meets the conditions . . . in any of the following subdivisions . . . ." Subdivision (d), on which Ron bases his paternity claim, provides that a man is presumed to be a child's father if he "receives the child into his home and openly holds out the child as his natural child."

Section 7612 addresses conflicting presumptions of paternity. It provides in relevant part:

"(a) Except as provided in Chapter 1 (commencing with Section 7540) [conclusive presumption as child of marriage] and Chapter 3 (commencing with Section 7570) of Part 2 [voluntary declaration of paternity] or in Section 20102 [repealed], a presumption under Section 7611 is a rebuttable presumption affecting the burden of proof and may be rebutted in an appropriate action only by clear and convincing evidence.

"(b) If two or more presumptions arise under Section 7610 or 7611 that conflict with each other, or if a presumption under Section 7611 conflicts with a claim pursuant to Section 7610, the presumption which on the facts is founded on the weightier considerations of policy and logic controls.

"(c) The presumption under Section 7611 is rebutted by a judgment establishing paternity of the child by another man."

14

*B.* *Establishment of Paternity by Voluntary Declaration*

Pursuant to section 7570, the Legislature "hereby finds and declares" that there is a "compelling state interest in establishing paternity for all children. Establishing paternity is the first step toward a child support award, which, in turn, provides children with equal rights and access to benefits, including, but not limited to, social security, health insurance, survivors' benefits, military benefits, and inheritance rights. . . . A simple system allowing for establishment of voluntary paternity will result in a significant increase in the ease of establishing paternity, a significant increase in paternity establishment, an increase in the number of children who have greater access to child support and other benefits, and a significant decrease in the time and money required to establish paternity due to the removal of the need for a lengthy and expensive court process to determine and establish paternity and is in the public interest." (Subds. (a), (b).)

Consistent with the legislative purpose set out in section 7570, section 7571 requires hospitals to provide a voluntary declaration of paternity to "the natural mother and . . . the man identified by the natural mother as the natural father." The voluntary declaration of paternity must contain, at a minimum, the names of the mother, father, and child, the child's date of birth, "[a] statement by the mother that . . . the man who has signed the voluntary declaration of paternity is the only possible father," and "[a] statement by the father that . . . he is the biological father of the child, and that he consents to the establishment of paternity by signing the voluntary declaration of paternity." (§ 7574, subd. (b).)

"[A] completed voluntary declaration of paternity . . . that has been filed with the Department of Child Support Services shall establish the paternity of a child and shall have the same force and effect as a judgment for paternity issued by a court of competent jurisdiction. The voluntary declaration of paternity shall be recognized as a basis for the establishment of an order for child custody, visitation, or child support." (§ 7573.) However, if genetic tests demonstrate that the man who signed the voluntary declaration

15

of paternity is not "the father of the child," the court may set the declaration aside. (§ 7575, subd. (b)(1).)

### C. The Child Dependency Laws

#### 1. <u>"Presumed" and "Biological" Fathers</u>

Section 300 et seq. of the Welfare and Institutions Code contain a series of provisions relating to dependent children. The Legislature's purpose in adopting these provisions was "to provide maximum safety and protection for children who are currently being physically, sexually, or emotionally abused, being neglected, or being exploited, and to ensure the safety, protection, and physical and emotional well-being of children who are at risk of that harm. This safety, protection, and physical and emotional well-being may include provision of a full array of social and health services to help the child and family and to prevent reabuse of children." (Welf. & Inst. Code, § 300.2.) In giving effect to these provisions, "[t]he focus shall be on the preservation of the family as well as the safety, protection, and physical and emotional well-being of the child." (*Id.*, § 300.2.)

The child dependency statutes refer to "presumed," "alleged," and "biological" fathers, but do not define these terms. (E.g., Welf. & Inst. Code, §§ 290.2 [notice shall be given to "[t]he father or fathers, presumed and alleged"], 291 [same], 292 [notice shall be given to "[t]he presumed father or any father receiving services], 293 [same], 361.5 [child welfare services shall be provided to "statutorily presumed father," and may also be provided to "the biological father"]; see also *In re Zacharia D*. (1993) 6 Cal.4th 435, 448.) Accordingly, the courts have looked to section 7611 to define "presumed father." (See *In re Jerry P.*, *supra*, 95 Cal.App.4th at p. 802 ["To identify fathers who, by reason of their parenting relationship, are entitled to seek reunification services and custody the Legislature borrowed the categories of men who are 'presumed to be the natural father[s]' of children under Family Code section 7611, hence the term 'presumed father.'" (Fn. omitted.)].)

16

Although the dependency laws borrow the "presumed father" and "natural" or "biological" father terminology of section 7611, these terms have unique significance in dependency proceedings. For dependency purposes, "[a] natural father is one who has been established as a child's biological father. ([*In re Jerry P.*, *supra*, 95 Cal.App.4th] at p. 801.) Use of the term 'natural father' means that while the man's biological paternity has been established, he 'has not achieved presumed father status as defined in [former] Civil Code section 7004 [now, section 7611].' (*In re Zacharia D.*[, *supra*,] 6 Cal.4th [at p.] 449, fn. 15.)" (*In re A.A.* (2003) 114 Cal.App.4th 771, 779, fn. omitted.) A "presumed father," in contrast, is one "'who "promptly comes forward and demonstrates a full commitment to . . . paternal responsibilities—emotional, financial, and otherwise[.]"'" (*In re Jerry P.*, *supra*, 95 Cal.App.4th at pp. 801-802.) A natural father can be a presumed father, but is not necessarily one; and a presumed father can be a natural father, but is not necessarily one. (*Id.* at p. 801.)" (*In re A.A.*, *supra*, 114 Cal.App.4th at p. 779.)[5] These categories "are meant 'to distinguish between those fathers who have entered into some familial relationship with the mother and child and those who have not.' (*In re Sabrina H.* (1990) 217 Cal.App.3d 702, 708.)" (*In re P.A.* (2011) 198 Cal.App.4th 974, 979-980.) In other words, "'[T]he term "presumed father" is . . . a term of convenience used to identify a preferred class of fathers by reference to the familial bonds described in section 7611 which the Legislature has determined reasonably approximates the class of fathers it wishes to benefit.' ([*In re Jerry P.*, *supra*, 95 Cal.App.4th] at p. 805, fn. omitted.)" (*In re P.A.*, *supra*, 198 Cal.App.4th at p. 980.)

"Presumed fathers are accorded greater rights than are mere natural fathers. (*In re Zacharia D.*, *supra*, 6 Cal.4th at pp. 448-449.) For example, section 361.5, subdivision (a) of the Welfare and Institutions Code provides that except in circumstances not relevant here, 'whenever a child is removed from a parent's or guardian's custody, the juvenile court *shall* order the social worker to provide child welfare services to the child

---

[5]    An "alleged father" "may be the father of a dependent child. However, he has not yet been established to be the child's natural or presumed father." (*In re A.A.*, *supra*, 114 Cal.App.4th at p. 779.)

and the child's mother and *statutorily presumed father* or guardians.  Upon a finding and declaration of paternity by the juvenile court or proof of a prior declaration of paternity by any court of competent jurisdiction, the juvenile court *may* order services for the child and the biological father, if the court determines that the services will benefit the child.'  (Italics added.)"  (*In re A.A.*, *supra*, 114 Cal.App.4th at pp. 779-780.)  Further, "[o]nly a statutorily presumed father is entitled to appointed counsel[.]"  (*In re P.A.*, *supra*, 198 Cal.App.4th at p. 980.)

Our courts have explained the enhanced status granted presumed fathers as follows:  "[A] presumed father, who has lived with a child and treats the child as a son or daughter, has developed a parent-child relationship that should not be lightly dissolved.  This type of familial relationship is much more important, at least to the child, than a biological relationship of actual paternity.  (*In re Nicholas H*. (2002) 28 Cal.4th 56, 65.)  ""'Parental rights do not spring full-blown from the biological connection between parent and child.  They require relationships more enduring.'""  (*In re Christopher M.* [(2003) 113 Cal.App.4th 155,] 160, quoting *Lehr v. Robertson* (1983) 463 U.S. 248, 260.)"  (*In re P.A.*, *supra*, 198 Cal.App.4th at p. 980.)

2.     In the Dependency Context, the "Presumption" of Paternity Is Substantive, Not Evidentiary

Although the dependency statutes borrow the "presumed father" language of the UPA, the "presumption" in the dependency context has been held to be a substantive designation, *not* an evidentiary presumption of biological paternity.  Our Supreme Court addressed this issue in *In re Nicholas H.*, *supra*, 28 Cal.4th 56, in which it considered whether a man's admission that he was not a child's biological father necessarily rebutted the presumption of paternity that arose under section 7611(d).  There, the child's mother met Thomas when she was pregnant with Nicholas; the mother and Thomas never married, but they lived together with Nicholas for several years.  (*Id*. at p. 60.)  After mother and Thomas's relationship ended, Nicholas lived with Thomas for a period of time.  Thomas "has provided Nicholas with significant financial support over the years,

18

and he has consistently referred to and treated Nicholas as his son. 'In addition, there is undisputed evidence that Nicholas has a strong emotional bond with Thomas and that Thomas is the only father Nicholas has ever know[n].'" (*Id*. at p. 61.) Under these circumstances, the Supreme Court held that Thomas's admission that he was not Nicholas's biological father did *not* defeat his section 7611(d) presumption of paternity. (*Id*. at p. 63.)

The court reached a similar result in *In re Jerry P*., *supra*, 95 Cal.App.4th 793.[6] There, the child's mother and J.R. had a relationship for about a year, and Jerry was conceived during that period. (*Id*. at p. 797.) Jerry was detained shortly after his birth because he tested positive for cocaine; J.R. appeared at the Welfare and Institutions Code section 366.26 hearing and sought presumed father status. The juvenile court ordered a paternity test, which revealed that J.R. was not Jerry's biological father. (*Id*. at p. 798.) The court thereupon entered an order that J.R. was not Jerry's presumed father and denied his motion for reunification services. (*Id*. at p. 801.)

The Court of Appeal reversed, concluding that lack of a biological relationship to a child does not necessarily defeat presumed father status. (*Id*. at p. 803.) This is so, the court said, because in the dependency context "presumed fatherhood" is a *substantive* designation, not an evidentiary presumption:

"The primary purpose of section 7611, a part of the Uniform Parentage Act, is to establish a child's paternity through a series of rebuttable presumptions. In dependency proceedings, however, the purpose of section 7611 is not to establish paternity. Rather, . . . the purpose is to determine whether the alleged father has demonstrated a sufficient commitment to his parental responsibilities to be afforded rights *not* afforded to natural fathers—the rights to reunification services and custody of the child. Therefore, in dependency proceedings the term 'presumed father' does not denote a presumption of fatherhood in the evidentiary sense and presumed father status is not rebutted by evidence

---

[6]    The Supreme Court granted review in *Jerry P*. on May 1, 2002, S104863, pending its disposition of *In re Nicholas H*., S100490; it subsequently dismissed review and ordered the Court of Appeal opinion published on June 6, 2002.

19

someone else is the natural father. The Supreme Court's decisions in *Adoption of Kelsey S.* [(1992) 1 Cal.4th 816] and *In re Zacharia D.* and the statutory scheme itself support our conclusion.

"Our Supreme Court has observed on several occasions presumed father status, when used to connote a father with financial and social ties to the child, is unrelated to natural father status. In *Adoption of Kelsey S.* the court stated: 'A man's parentage of a child may be undisputed and legally proven, but he may nevertheless fail to be a "presumed father" . . . . Conversely, even if paternity is denied *and legally disproved*, a man may be deemed, under some circumstances, to be a "presumed father."' Although *Adoption of Kelsey S.* was an adoption case, it relied on the same categories in section 7611 for determining presumed father status as are used in dependency cases. Moreover, in *In re Zacharia D.*, which was a dependency case, the court noted 'it is possible for a man to achieve presumed father status, with its attendant rights and duties, without being the biological father.' The court's observations suggest in the dependency context the term 'presumed father' is not an evidentiary term but a term of convenience used to identify a preferred class of fathers by reference to the familial bonds described in section 7611 which the Legislature has determined reasonably approximates the class of fathers it wishes to benefit.

"The conclusion [that] presumptive fatherhood is not an evidentiary presumption in the dependency context is also clear from the fact that in dependency proceedings a 'presumed father' has greater rights than a 'natural father.' It would not make sense to use the categories in section 7611 simply to establish an evidentiary presumption a man is a 'natural father' when being a 'natural father' is a step *below* being a 'presumed father.'

"Moreover, if the role of section 7611 in a dependency proceeding was merely to establish an evidentiary presumption a man was the child's natural father, a man who was already established to be the child's natural father before dependency proceedings commenced could never become a 'presumed father' because a presumption under the statute would be unnecessary. We fail to see the rationality in a system which would

20

confer more rights on a father when his biological tie to the child is unknown than when it is." (*In re Jerry P.*, *supra*, 95 Cal.App.4th at pp. 804-805, fns. omitted.)

Because presumptive fatherhood has an entirely different meaning in the dependency context than it does in the paternity context, courts are necessarily cautious about a wholesale importation of the UPA into dependency proceedings without reference to the dependency scheme's unique goals. With these distinctions in mind, we now turn to the particular questions presented.

**II.      Merely Signing a Declaration of Paternity Does Not Entitle Francisco to Presumed Father Status in This Dependency Action**

Francisco urges that because he signed a voluntary declaration of paternity, he is entitled to presumed father status in Brianna's dependency action. For the reasons that follow, we do not agree.

*A.      Dependency Cases in Which Biological Fathers Who Had Obtained Paternity Judgments Were Denied Presumed Father Status*

In *In re E.O.* (2010) 182 Cal.App.4th 722, two children were removed from their mother's custody after repeated sexual abuse by mother's boyfriend. N.M. appeared in the action and filed a notice of a judgment entered six years earlier, which found him to be the father of both children and ordered him to pay child support. Notwithstanding the judgment, the court denied N.M.'s request for presumed father status. (*Id.* at pp. 724-725.)

N.M. appealed, urging that he should have been granted presumed father status. He noted that the paternity judgment declared him to be the children's father, and section 7636 provides that a "judgment . . . of the court determining the existence . . . of the parent and child relationship is determinative for all purposes . . . ." Thus, N.M. contended, the paternity judgment "'required the juvenile court to consider [him] the children's presumed father.'" (*In re E.O.*, *supra*, 182 Cal.App.4th at p. 727.)

21

The Court of Appeal disagreed, explaining as follows: "*[A]ppellant's argument on this point misconstrues the nature of the prior judgment.* A paternity judgment is, as the name implies, a judicial determination that a parent-child relationship exists. It is designed primarily to settle questions of biology and provides the foundation for an order that the father provide financial support. For example the judgment at issue here declared appellant to be one of E.O. and Y.O.'s 'parents' and states he had the obligation to provide them '$0.00' in monthly child support. Presumed father status, by contrast, is concerned with a different issue: whether a man has promptly come forward and demonstrated his '"full commitment to his parental responsibilities—emotional, financial, and otherwise."' (*In re Jerry P.*, *supra*, 95 Cal.App.4th at pp. 801-802.) We would endorse 'an interpretation that would lead to absurd consequences' if we were to conclude that a paternity judgment that is focused narrowly on biological and financial issues is determinative on subsequent issues that are unrelated to and far beyond its scope. (*In re M.B.* (2009) 174 Cal.App.4th 1472, 1477.) We decline to read the applicable statutes in an absurd manner." (*In re E.O.*, *supra*, 182 Cal.App.4th at pp. 727-728.)

The court reached a similar conclusion in *In re Cheyenne B.* (2012) 203 Cal.App.4th 1361. There, the child's biological father, Richard, contended that he was entitled to presumed father status in his daughter's dependency action because he had been judicially determined to be her father for purposes of child support. (*Id.* at pp. 1370-1371.) The court disagreed: "'"Presumed fatherhood, for purposes of dependency proceedings, denotes one who 'promptly comes forward and demonstrates a full commitment to . . . parental responsibilities—emotional, financial, and otherwise[.]"' [Citation]' [Citation.] [¶] Nowhere in section 7611 or in the case law interpreting that section does it state that a prior paternity judgment requires a trial court to find the holder of such judgment must *thereby* be a presumed father. (*In re Margarita D.* (1999) 72 Cal.App.4th 1288, 1296, 1298 [stating 'the presumed father finding is not the same as the paternity judgment[,]' therefore, the appellant must still establish facts in order to be found the child's presumed father to attain full standing and status in the dependency

proceeding, which he failed to do].) In our view, requiring a man who holds a judgment of paternity to also satisfy the requirements necessary to be considered a presumed father, with its attendant rights and obligations, does not constitute a redetermination of paternity. Instead, it is a determination of the extent, nature and quality of his relationship with the child at issue." (*In re Cheyenne B.*, *supra*, at p. 1376.)

B.    *Francisco Has Not Established That He Is Brianna's Presumed Father as a Matter of Law in This Dependency Action*

Francisco correctly notes that section 7573 provides that a completed voluntary declaration of paternity "shall establish the paternity of a child and shall have the same force and effect as a judgment for paternity issued by a court of competent jurisdiction." However, the cases just discussed establish that a judgment for paternity does *not* entitle Francisco to presumed father status in this dependency proceeding. To be entitled to such status, Francisco had to demonstrate that he "has promptly come forward and demonstrated his '"full commitment to his parental responsibilities—emotional, financial, and otherwise."'" (*In re E.O.*, *supra*, 182 Cal.App.4th at p. 728.) He has not done so. To the contrary, the record demonstrates that Francisco had no contact with his daughter between 2006 and 2010; he saw Brianna only twice in 2010, and then did not see her or have further contact with her until these dependency proceedings began in 2012. As a matter of law, such limited and sporadic contact is not sufficient to entitle Francisco to presumed father status in this proceeding.

We do not believe that section 7611 compels a different result. That section provides, among other things, that "[a] man *is presumed to be the natural father of a child* if he meets the conditions provided in . . . Chapter 3 (commencing with Section 7570)"—i.e., he has completed a voluntary declaration of paternity. (Italics added.) But while this presumption is relevant to a determination of *biological* paternity, we do not believe it relevant to presumed father status in the dependency context. As we have explained, in the context of determining biological paternity (and the child support obligations that flow from it), section 7611 establishes a series of evidentiary

23

presumptions that are rebuttable in appropriate cases. Signing and filing a voluntary declaration of paternity is one way in which a man may be presumed to be a child's biological father under this section. In the dependency context, however, "presumed" fatherhood is substantive, not evidentiary. In other words, a designation of presumed fatherhood does not suggest that a man is "presumed" to be the biological father, but rather that he has, through his conduct, established a relationship with a dependent child that the state has deemed worthy of nurturing and preserving. Thus, while executing a voluntary declaration of paternity entitles a man to be presumed a child's biological father, it does *not* entitle him to presumed father status in a dependency proceeding.

Our conclusion is consistent with Welfare and Institutions Code section 361.5, subdivision (a), which provides that the juvenile court "*shall* order the social worker to provide child welfare services to the child . . . and statutorily presumed father," and "*may* order services for the child and the biological father, if the court determines that the services will benefit the child" "[u]pon a finding and declaration of paternity by the juvenile court or proof of a prior declaration of paternity by any court of competent jurisdiction." (Italics added.) This section makes sense only if a declaration of paternity does not automatically entitle a man to presumed father status; if it were otherwise, the second clause would be completely superfluous.

Were we to conclude that executing a voluntary declaration of paternity automatically entitles a man to presumed father status in the dependency context, we would make precisely the error the court eschewed in *In re E.O.*, *supra*, 182 Cal.App.4th 722. Like a paternity judgment, a voluntary declaration of paternity is "designed primarily to settle questions of biology." (*Id.* at p. 727.) It is for this reason that a voluntary declaration of paternity must include "[a] statement by the mother that . . . the man who has signed the voluntary declaration of paternity is the only possible father" and "[a] statement by the father that . . . he is the biological father of the child." (§ 7574, subd. (b).) It is also for this reason that a court may set aside a voluntary declaration of paternity if genetic tests establish that "the man who signed the voluntary declaration [of paternity] is not the father of the child." (§ 7575, subd. (b)(1).) As the court noted in *In*

24

*re E.O.*, we would "endorse 'an interpretation that would lead to absurd consequences' if we were to conclude that a [voluntary declaration of paternity] that is focused narrowly on biological and financial issues is determinative on subsequent issues that are unrelated to and far beyond its scope." (182 Cal.App.4th at p. 728.) Like the *E.O.* court, we decline to read the statute in such a manner.

Moreover, were we to conclude that a voluntary declaration of paternity entitled a man to presumed father status in a dependency action, we would elevate it above a paternity judgment, in violation of section 7573's mandate that a completed voluntary declaration of paternity "shall have *the same force and effect* as a judgment for paternity issued by a court of competent jurisdiction." (Italics added.) As we have seen, a paternity judgment does not entitle a man to presumed father status in a dependency action. (*In re E.O.*, *supra*, 182 Cal.App.4th 722; *In re Cheyenne B.*, *supra*, 203 Cal.App.4th 1361.) If a voluntary declaration of paternity were to give a man presumed father status in such an action, the voluntary declaration would not have "the *same* force and effect" as a judgment—it would have a force and effect different than, and superior to, a judgment.

Finally, there is no suggestion in the dependency statutes that the Legislature intended to grant preferred status in a dependency action to a man who has completed a voluntary declaration of paternity, but has not otherwise established a relationship with his child. Such a conclusion would have the effect of mandating reunification services to a biological father who, as in this case, has had virtually no contact with his child in many years and whom the child does not know as her father. There is no suggestion in the Welfare and Institutions Code that the Legislature intended such a result.

III. **The Voluntary Declaration of Paternity Signed by Mother and Francisco Did Not Supplant Ron's Presumed Father Status**

It is undisputed that Ron was entitled to presumed father status under section 7611(d) because he "receive[d] [Brianna] into his home and openly [held] out [Brianna] as his natural child." Francisco contends, however, that pursuant to sections 7573 and

7612(c), his voluntary declaration of paternity supplanted Ron's presumed father status. For the following reasons, we do not agree.

### A. Section 7612(c) Does Not Require That Ron Be Denied Presumed Father Status

Section 7612(c) provides: "The presumption [of paternity] under Section 7611 is rebutted by a judgment establishing paternity of the child by another man." As we have said, section 7573 provides that a completed voluntary declaration of paternity has "the same force and effect as a judgment for paternity issued by a court of competent jurisdiction." Francisco contends that these two sections, when read together, compel the conclusion that his voluntary declaration of paternity, which under section 7573 is the functional equivalent of a judgment, rebuts Ron's section 7611(d) presumed father status.

We agree with Francisco in part. By the plain language of section 7612(c), Francisco's voluntary declaration of paternity "rebut[s]" the "presumption [of paternity] under Section 7611." As we have said, the "presumption" created by section 7611 is that "[a] man" (Ron) "is . . . the natural father of a child" (Brianna). (§ 7611.) Thus, under these sections, Francisco's voluntary declaration of paternity rebuts the evidentiary presumption of section 7611(d) that Ron is Brianna's natural father. But as such, it is irrelevant to these proceedings, because Francisco's biological relationship with Brianna has never been at issue.

We do not agree, however, that the voluntary declaration of paternity has the effect of extinguishing Ron's presumed father status for purposes of this dependency proceeding. As previously discussed, section 7611's relevance in dependency proceedings is not to establish biological paternity, but to "determine whether the alleged father has demonstrated a sufficient commitment to his parental responsibilities to be afforded rights *not* afforded to natural fathers—the rights to reunification services and custody of the child." (*In re Jerry P.*, *supra*, 95 Cal.App.4th at p. 804.) Therefore, in dependency proceedings, the term "presumed father" does not denote a presumption of fatherhood in the evidentiary sense, and presumed father status is not rebutted by

26

evidence that someone else is the biological father. (*Ibid*.) Since a paternity judgment is a judicial determination of only biological paternity—and because biological paternity is irrelevant to presumed father status in the dependency context—a judgment establishing biological paternity in one man cannot overcome a court's finding of substantive presumed father status in another man.

The conclusion that section 7612(c) is irrelevant to presumed father status in a dependency action is, we believe, compelled by the language of that section. Section 7612(c) says that a presumption under section 7611 "is rebutted by" a judgment establishing paternity in another man. While an evidentiary presumption can be "rebutted," a substantive determination of status cannot. Stated differently, it is linguistically nonsensical to speak of "rebutting" a person's status in a dependency proceeding, because to "rebut" means "*[i]n pleading and evidence*, to defeat, refute, or take away the effect of something." (Black's Law Dict. (5th ed. 1979) p. 1139, col. 2, italics added.) While one can "rebut" a presumption, one cannot "rebut" a person's status. Had the Legislature intended section 7612(c) to *extinguish* substantive presumed father status under specified circumstances, it certainly would have said so.

Further, our conclusion is consistent with section 7573, which says that a voluntary declaration of paternity "shall be recognized as a basis for the establishment of an order *for child custody, visitation, or child support*." Notably, this section does *not* say that a voluntary declaration of paternity shall be the basis for an order in a dependency proceeding, or that it shall displace another man's presumed father status. Instead, on its face it limits the effect of a voluntary declaration of paternity to those determinations typically made in a *family court* proceeding (as opposed to a *juvenile court* proceeding)—i.e., custody, visitation, or support.

More importantly, our interpretation of section 7612(c) is consistent with Welfare and Institutions Code section 202, subdivision (d), which provides that juvenile courts "shall consider . . . the best interests of the minor in *all deliberations* pursuant to this chapter." (Italics added.) Interpreting section 7612(c) to allow a court to give presumed father status to a man who has acted as a child's father is consistent with the dictates of

27

this section. In contrast, a bright line rule requiring a court to deny a man presumed father status without considering the best interests of the child violates Welfare and Institutions Code section 202, subdivision (d)'s mandate that the child's best interests must be considered "*in all deliberations*" pursuant to this chapter. (Italics added.)

As we have demonstrated, Francisco cannot be designated Brianna's presumed father *whether or not* Ron is deemed to have achieved that status. Thus, denying Ron presumed father status will leave Brianna without a presumed father. As the *Jerry P.* court said in a related context, "[w]e do not believe the Legislature intended to create such a dog-in-the-manger rule." (*Jerry P.*, *supra*, 95 Cal.App.4th at p. 804.)[7]


### B.      *Our Conclusion Is Consistent With Prior Case Law*

Our conclusion in the present case is consistent with the court's analysis in *In re P.A.* (2011) 198 Cal.App.4th 974, 983. There, Alvaro was P.A.'s biological father, but Roger married P.A.'s mother shortly after P.A.'s birth and provided her with a home, food, and clothing. After DCFS filed a dependency petition on P.A.'s behalf, Alvaro requested a paternity test. When the test showed Alvaro was P.A.'s father, Alvaro requested a judgment of paternity. (*Id.* at p. 978.) Roger opposed Alvaro's request and requested a hearing to allow the court to balance the interests of the two fathers and, ultimately, to have a paternity judgment entered in his favor. The juvenile court found it unlikely that Roger could disprove Alvaro's biological paternity; it further found that Alvaro's status as P.A.'s biological father entitled him to a paternity judgment, therefore rebutting Roger's presumed father status. (*Ibid.*) Roger appealed.

---

[7]      The metaphor of the dog in the manger "derives from an old Greek fable which has been transmitted in several different versions. Interpreted variously over the centuries, the metaphor is now used to speak of those who spitefully prevent others from having something that they themselves have no use for. . . . The short form of the fable . . . is: *There was a dog lying in a manger who did not eat the grain but who nevertheless prevented the horse from being able to eat anything either*." <http://en.wikipedia.org/wiki/The_Dog_in_the_Manger> (as of Oct. 21, 2013).

28

The Court of Appeal reversed the paternity judgment for Alvaro and remanded the case to the juvenile court. It explained that a man's status as biological father based on genetic testing does not entitle him to the rights or status of a presumed father. In determining presumed father status, "'"'it is irrelevant that the biological father can prove his paternity or even that all parties to the proceedings may concede that [he] is the biological father.'"' (*In re Elijah V.* (2005) 127 Cal.App.4th 576, 585-586.) Indeed, courts consistently recognize 'the extant father-child relationship is to be preserved at the cost of biological ties.' (*In re Raphael P.* (2002) 97 Cal.App.4th 716, 728-729.)" (*In re P.A.*, *supra*, 198 Cal.App.4th at p. 980.) For the same reason, a paternity judgment would not necessarily elevate Alvaro's claim over Roger's: "'A paternity judgment is, as the name implies, a judicial determination that a parent-child relationship exists. It is designed primarily to settle questions of biology and provides the foundation for an order that the father provide financial support.' (*Ibid*.) In the context of this dependency proceeding, however, the issue is not one of biology and child support, but rather the right to reunification services and possible custody of a dependent child. Thus, we disagree with the respondents' interpretation of section 7612, subdivision (c), that would allow Alvaro's judgment of paternity to automatically extinguish Roger's rights as a presumed father. Any other result would incorrectly elevate biological status over presumed status, and would contradict well-established law that "'blood evidence is [not] conclusive of fatherhood in *all* circumstances, [nor does] it automatically eliminate[] *other* presumptions of fatherhood.'" (*In re Jesusa V.*, *supra*, 32 Cal.4th at p. 618.)"[8] (*In re P.A.*, *supra*, at p. 983.)

---

[8] In so concluding, the court distinguished its earlier decision in *In re Levi H.* (2011) 197 Cal.App.4th 1279, which we discuss below. The court noted that in *Levi H.*, one father had executed a voluntary declaration of paternity, while in the case before it, there was neither a voluntary declaration of paternity nor a paternity judgment. The court explained the distinction between the two cases as follows: "Section 7612, subdivision (c), provides that a paternity presumption under section 7611 'is rebutted by a judgment establishing paternity of the child by another man.' The plain language of that subdivision refers to a *judgment*, not merely a *finding* regarding biological tests used to determine if a man is the child's natural father. [Citation.] This distinction is critical. . . .

*C.     The Cases Francisco Relies on Do Not Compel a Different Result*

Francisco relies on *Kevin Q. v. Lauren W.* (2009) 175 Cal.App.4th 1119 (*Kevin Q.*) and *In re Levi H.*, *supra*, 197 Cal.App.4th 1279, for the proposition that because he executed a voluntary declaration of paternity, he can be the only presumed father in this action.  For the reasons that follow, we do not agree.

1.     <u>*Kevin Q.*</u>

*Kevin Q.*, *supra*, 175 Cal.App.4th 1119, was an appeal in a family law paternity action of a custody and visitation order concerning two-year-old Matthew W.  Matthew was the biological child of mother and Brent A., who were never married.  During mother's pregnancy with Matthew, mother began living with Kevin Q., who was present at Matthew's birth, held Matthew out as his natural son, and paid all of Matthew's expenses.  When Matthew was 20 months old, mother and Kevin separated, and Kevin petitioned under section 7630 to be designated Matthew's presumed father and for legal and physical custody of (or reasonable visitation with) the child.  (*Id.* at pp. 1124-1125.)  Mother opposed Kevin's petition and filed a voluntary declaration of paternity signed by mother and Brent, as well as the results of genetic tests identifying Brent as Matthew's biological father.  (*Id.* at p. 1128.)

---

[A] section 7611 presumption is rebutted by a prior judgment because that 'judgment acts to preclude the issue of paternity from being *redetermined*.' [Citation.]  . . . [¶]  Here, a scientific finding that Alvaro is P.A.'s biological father is not the same as a paternity judgment.  There was no prior judgment establishing Alvaro's paternity." (*In re P.A.*, *supra*, 198 Cal.App.4th at p. 982.)

We do not agree with the *In re P.A.* court that a paternity judgment is meaningfully different than a biological finding of paternity for present purposes, nor do we believe that such a distinction is consistent with the court's own reasoning.  The *In re P.A.* court said—we believe correctly—that a paternity judgment, like a DNA test, "'is designed primarily to settle questions of *biology*.'" (198 Cal.App.4th at p. 983, italics added.)  The logical implication of this statement is, we believe, that a judgment of paternity, like a DNA test, should be irrelevant to presumed father status in a dependency proceeding because the issue "is not one of biology and child support, but rather the right to reunification services and possible custody of a dependent child." (*Ibid*.)

30

The superior court weighed Kevin's paternity claim against Brent's and concluded that Kevin was Matthew's legal father pursuant to section 7611(d) because he "'receive[d] the child into his home and openly [held] out the child as his natural child.'" (*Kevin Q.*, *supra*, 175 Cal.App.4th at p. 1130, quoting § 7611(d).) The Court of Appeal reversed, explaining as follows:

"The language of section 7573 is clear: A voluntary declaration of paternity, duly completed and filed after 1996, has 'the same force and effect as a judgment for paternity . . . .' Equally clear is the language of section 7612, subdivision (c): A section 7611 presumption 'is rebutted by a judgment establishing paternity of the child by another man.' And section 7612, subdivision (a), listing the section 7611 presumptions that are rebuttable, expressly *excludes* presumed father status arising from a declaration of paternity as one of the rebuttable presumptions. . . .

"Section 7575 delineates the only circumstances under which a court may set aside a voluntary declaration of paternity. No statute grants a court the discretion to ignore, or treat as a rebuttable presumption, a voluntary declaration of paternity accorded the force of a judgment under section 7573. It is a 'cardinal rule that courts may not add provisions to a statute.' [Citation.]

"Brent's declaration of paternity was filed within two years of the child's birth, yet Kevin never moved for genetic tests under section 7575 to disprove Brent's biological paternity. Nor has Kevin ever challenged Brent's declaration on equitable grounds such as extrinsic fraud. Thus, Kevin never availed himself of statutory options for challenging Brent's voluntary declaration.

". . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

"In sum, Brent signed and filed a valid declaration of paternity that has the force of a judgment under section 7573 and trumps Kevin's presumption under section 7611, subdivision (d)." (*Kevin Q.*, *supra*, 175 Cal.App.4th pp. 1137-1139, fns. omitted.)

As the above discussion makes clear, *Kevin Q.* was a paternity action, not a dependency proceeding. The question before the court, therefore, was which man, Brent or Kevin, was the child's biological father. The case has no bearing on the question

before us—i.e., which man is entitled to presumed father status in this dependency proceeding, *not* who is Brianna's biological father.

### 2.       *In re Levi H.*

In *In re Levi H.*, *supra*, 197 Cal.App.4th 1279, Levi was born to Jade (mother) and Andrew, who were unmarried. The day after the birth, the parents signed a voluntary declaration of paternity. They married several months later, but subsequently separated and then divorced. (*Id.* at pp. 1283-1284.) Mother then married Michael, with whom she had another child. That child suffered a serious head injury when he was three months old, and DCFS filed petitions on behalf of both children. (*Id.* at p. 1284.) In the dependency proceeding, mother submitted a parentage questionnaire stating that Andrew was Levi's father, and Michael submitted a parentage questionnaire in which he stated that he had lived with and supported Levi since infancy. (*Ibid.*)

At the detention hearing, the court designated Michael as Levi's presumed father. At the jurisdiction and disposition hearing, however, Andrew appeared and asked to be designated Levi's presumed father because he had signed a voluntary declaration of paternity. The juvenile court found as a matter of law that the voluntary declaration of paternity rebutted the presumption in favor of Michael and, therefore, that Andrew was Levi's presumed father. (*In re Levi H.*, *supra*, 197 Cal.App.4th at p. 1285.)

Michael appealed, contending that the juvenile court erred in finding that Andrew's voluntary declaration of paternity rebutted Michael's presumed father status. (*In re Levi H.*, *supra*, 197 Cal.App.4th at p. 1286.) The court disagreed and affirmed: "We agree with the *Kevin Q.* analysis that presumed fatherhood based on a voluntary declaration of paternity is not to be weighed against other section 7611 presumptions. (*Kevin Q.*, *supra*, 175 Cal.App.4th at p. 1141.) Indeed, that result is mandated by the statutory scheme. Andrew's voluntary declaration of paternity, which has the same force and effect as a paternity judgment (§ 7573), rebuts Michael's presumption under section 7611, subdivision (d) as a matter of law (§ 7612, subds. (a), (c)), and thus subdivision (b) of section 7612 is not triggered. In other words, since Andrew's presumption

32

*extinguishes* Michael's presumption, there are not two conflicting presumptions subject to the weighing process." (*In re Levi H*., *supra*, at p. 1290.)

We respectfully disagree with the court's conclusion in *In re Levi H*., which adopted wholesale the analysis of *Kevin Q*. without recognizing the important differences between paternity and dependency actions discussed in this opinion. As we have said, in the dependency context, presumed fatherhood is a function of a man's commitment to parental responsibilities, *not* his biology. As such, we do not read the relevant statutes to permit a man's presumed father status in a dependency action to be extinguished by a judicial determination of another man's biological connection to child.

> D.      *By Designating Ron as Brianna's Presumed Father, the Juvenile Court Did Not Terminate Francisco's Parental Rights*

Francisco contends that when the juvenile court denied him presumed father status after earlier granting him such status, it "effectively terminated [his] parental rights." This was improper, Francisco asserts, because to terminate parental rights, "there must be a parental unfitness finding by clear and convincing evidence in order to comply with due process."

Our Supreme Court considered and rejected a nearly identical contention in *In re Jesusa V*., *supra*, 32 Cal.4th 588. There, the court said as follows: "What Heriberto [the child's biological father] fails to apprehend . . . is that the identification of another man as Jesusa's presumed father does not *terminate* Heriberto's parental relationship with the child. Indeed, neither Heriberto nor our dissenting colleagues cite anything to support their assertion that a declaration of Paul's presumed fatherhood has rendered Heriberto a legal stranger to the child. A declaration of presumed fatherhood entitles the presumed father to reunification services and custody of the child (*In re Zacharia D*., *supra*, 6 Cal.4th at p. 439) *but does not itself terminate the biological father's parental relationship with the child.* (*Francisco G. v. Superior Court*, *supra*, 91 Cal.App.4th 586, 596.) Termination of parental rights requires further proceedings. (See Fam. Code, §§ 7664, 7800 et seq.; Welf. & Inst. Code, § 366.26; see generally *In re Malinda S*.

33

(1990) 51 Cal.3d 368, 383-384.)  Hence, no showing of Heriberto's unfitness was required before Paul could be declared Jesusa's presumed father." (*In re Jesusa V.*, *supra*, 32 Cal.4th at p. 610, italics added.)

The same analysis applies here.  Granting Ron presumed father status neither terminates Francisco's parental relationship with Brianna nor renders Francisco a "legal stranger" to Brianna.  The juvenile court therefore did not err in designating Ron as Brianna's presumed father.

We caution that our conclusion in no way restricts the discretion of the juvenile court to act in a dependent child's best interests.  Rather, in a case where more than one man claims presumed father status, our conclusion permits the court broad discretion to determine which man shall be designated "*the*" presumed father.

## IV.  DCFS Failed to Comply With the ICWA

Francisco contends finally that he is a member of the Gila River Community, a federally recognized Indian tribe.  He urges that DCFS therefore was required by ICWA to provide notice of the proceedings to the tribe, and to give the tribe the opportunity to intervene.  DCFS concedes that ICWA notice was not properly given and does not object to a remand with directions to the juvenile court to order DCFS to provide proper notice.

Pursuant to 25 United States Code section 1912(a), "[i]n any involuntary proceeding in a State court, where the court knows or has reason to know that an Indian child is involved, [DCFS] shall notify the parent or Indian custodian and the Indian child's tribe, by registered mail with return receipt requested, of the pending proceedings and of their right of intervention."  Welfare and Institutions Code section 224.2, subdivision (a)(1) similarly provides that notice to the tribe "shall be sent by registered or certified mail with return receipt requested."

Because DCFS failed to provide proper ICWA notice, we remand the matter to the juvenile court with directions to direct DCFS to comply with the notice provisions of ICWA.  However, we decline to reverse the jurisdictional and dispositional orders because there is not yet a sufficient showing that Brianna is an Indian child within the

meaning of ICWA.  If after proper inquiry and notice a tribe determines Brianna is an Indian child, any interested party may petition the court to invalidate any orders that violated ICWA.  (See *In re Hunter W*. (2011) 200 Cal.App.4th 1454, 1467; *In re Damian C*. (2009) 178 Cal.App.4th 192, 199-200.)

## DISPOSITION

The matter is remanded with directions to the juvenile court to direct DCFS to provide proper notice under ICWA; in all respects, the matter is affirmed.

**CERTIFIED FOR PUBLICATION**

SUZUKAWA, J.

We concur:

EPSTEIN, P. J.

WILLHITE, J.